George W. DIXON, Libelant-Appellee,

v.

UNITED STATES of America, Respondent-Appellant.

No. 100, Docket 23255.

United States Court of Appeals, Second Circuit.

Argued Oct. 15, 1954.

Decided Feb. 7, 1955.

Jacob Rassner, New York City, for libelant.

J. Edward Lumbard, U. S. Atty., New York City, Kirlin, Campbell & Keating, Vernon S. Jones, New York City, and Theodore P. Daly, Long Island City, of counsel, for respondent-appellant.

Before CHASE, MEDINA and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

The appellant's steamship Halton R. Carey sailed from New York in all respects seaworthy and was in that condition upon her arrival at Aalborg, Denmark, in November 1951. While she was discharging coal at that port stevedores accidentally broke out one of the three bottom rungs of the aft ladder in the No. 2 hatch and bent the other two. The appellee Dixon, who was the chief officer of the ship, discovered this damage and reported it both to the master and to the ship's agent ashore. The repair of the damage was promptly ordered and was undertaken by shore repairmen on the next afternoon. Before repairs were made, Dixon on that day had occasion to descend the ladder twice without mishap, and then shortly after two o'clock went ashore leaving the second mate, Nasta, on watch. He returned to the ship about half past four that afternoon and afterward had dinner with the master and Nasta. Meanwhile the repairmen had worked on the ladder and their foreman had reported to Nasta that the three rungs at the bottom of the ladder had been repaired. He had also told Nasta that other unidentified rungs were in need of some sort of unspecified repair, and had been told by Nasta to do whatever was necessary to put the ladder in seaworthy condition.

While at dinner, Dixon asked Nasta if the ladder had been repaired. Nasta

12

testified that he told him the substance of his conversation with the foreman, adding that he did not know whether the additional rungs had been repaired. Dixon testified that he recalled nothing being said about other rungs needing repair, but that he would not deny Nasta's contrary version of the conversation, which was supported by the master's testimony. The trial Court found the conversation to have been as Nasta testified. The master, who had been present throughout the conversation, then told Dixon to "check" the ladder, but said nothing more to indicate how it should be done, and Dixon received no warning either from the master or Nasta that it might be dangerous for him to descend the ladder.

Dixon testified as follows in response to questions as to what he understood was the meaning of the word "check," as used by the master: "The word 'check' means to go down and see whether it was fixed or not; whether it was in seaworthy condition; to find out whether it was fixed and ready to go to sea; whether the ladder had been repaired and repaired right." And also, "Test it in ways, go down it, inspect the rungs and see that none of them was loose or so forth; to see that maybe—sometimes they weld one side and just leave the other side unwelded. I have seen them do that and checked it and found that lots of times." He also testified that what he thought the master meant was to check the three bottom rungs, and he added: "That is the only thing I had in mind in going down to see that they put those rungs in and put them in right."

Dixon could have gone down into the hold by using another ladder and begun his inspection at the lower end of the damaged ladder, but instead he chose to go down the ladder he was to check. When he was part way down, a rung on which he stepped gave way. Then a higher one on which he was holding with his hands was pulled out, and four or five other rungs gave way as he fell to

the bottom, where he was severely injured.

The libel, as originally filed, sought recovery on the ground of liability for negligence under the Jones Act, 46 U.S.C.A. § 688, or alternatively on the ground of liability for unseaworthiness; but at the beginning of the trial all liability under the Jones Act was disclaimed and the appellee limited his cause of action to unseaworthiness. An additional claim for maintenance and cure has been satisfied and is no longer in issue.

As we read the record, the libelant pitched his claim entirely on the ground that the shipowner's warranty of seaworthiness—see Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927; Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143—applies to conditions arising after, as well as before, the voyage has commenced, so that the respondent here was liable for the admittedly unseaworthy condition of the ladder, whether or not any negligence for which it was chargeable was proved. The District Court appears to have accepted this approach. Overruling the defense of assumption of risk—and, amounting to the same thing, the contentions (a) that since it was Dixon's duty to ascertain whether the ladder was in seaworthy condition he could not recover for injuries sustained in discharging that duty, and (b) that the master's ordering of Dixon to "check" the ladder must be deemed to be a temporary withdrawal of it from Dixon's use—the Court found Dixon not to have been guilty of contributory negligence, and held the respondent fully liable. While the Court's opinion does not expressly consider whether a shipowner's warranty of seaworthiness extends to conditions arising after the ship has commenced her voyage, it seems implicit in the decision that

the Court thought it did, or at least that it extended to conditions arising at ports of call.

While language in some of the cases and texts does seem to reflect the view that the warranty to seamen is limited to conditions existing *before* the vessel has begun her voyage—liability for unseaworthy conditions coming into existence thereafter being only for failure to exercise due diligence—we are unable to find that any appellate court has squarely held the warranty to be so limited. See Zinnel v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 1925, 10 F.2d 47, 48; Ives v. United States, 2 Cir., 1932, 58 F.2d 201, 202; The H. A. Scandrett, 2 Cir., 1937, 87 F.2d 708; Globe S. S. Co. v. Moss, 6 Cir., 1917, 245 F. 54, 55, certiorari denied 245 U.S. 663, 38 S.Ct. 61, 62 L.Ed. 537; The Rolph, 9 Cir., 1924, 299 F. 52, certiorari denied 266 U.S. 614, 45 S.Ct. 96, 69 L.Ed. 468; The Calvert, 4 Cir., 1931, 51 F.2d 494; Robinson on Admiralty 304 (1939); II Norris, Law of Seamen 242, 254 (1952). Nor have we found any case in which it has been stated that absolute liability would be imposed with respect to unseaworthy conditions arising *after* the voyage had commenced.

Consequently, the question whether in this circumstance liability for unseaworthiness is absolute, or based on negligence, must be treated as one of first impression. The question is fraught with much difficulty, and since, as will appear later, there exist other grounds which may prove dispositive of the case, we think we should not reach this question until those grounds have been explored and found wanting. We have therefore concluded that our course should be to remand the case, reserving jurisdiction of this appeal in the event that such other grounds fail. Our reasons for this view can best be explained by surveying the historical development of the injured seaman's remedies.

Before 1902 the American admiralty courts had for the most part treated seamen injury cases on the same footing as cases involving injuries to shoreside employees. While the shipowner was under a duty to furnish his seamen with a safe place to work, including safe appliances—The Noddleburn, D.C.D.Or. 1886, 28 F. 855; The Neptuno, D.C.S.D. N.Y.1887, 30 F. 925—that duty was not an absolute one, but rather one of exercising due care. The France, 2 Cir., 1894, 59 F. 479; The Concord, D.C.S.D. N.Y.1893, 58 F. 913; The Flowergate, D.C.E.D.N.Y.1887, 31 F. 762. But the cases are not clear on whether the owner would be liable to the seaman in all instances where the seaman's injury was attributable to negligence chargeable to the owner. In The City of Alexandria, D.C.S.D.N.Y.1883, 17 F. 390, Addison Brown, the eminent admiralty judge, held upon an extensive review of the ancient admiralty precedents that the shipowner was liable only for such negligence as rendered the ship or her appliances unseaworthy. However, some of the later decisions appear to have held owners liable for negligence, although unseaworthiness, at least in the ordinary sense, had not been shown. The Frank and Willie, D.C.S.D.N.Y. 1891, 45 F. 494; The Edith Godden, D.C.S.D.N.Y.1885, 23 F. 43. But in 1902 the Supreme Court adopted The City of Alexandria rule. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. While seamen's rights were thus cut down by removing the basis for a negligence action where unseaworthiness did not exist, there is no indication that it was intended at the same time to enlarge their rights by permitting an action to be maintained without regard to negligence where unseaworthiness *did* exist. On the contrary, the tenor of The Osceola is that American law on this score was to be the same as the law of England, where the Merchant Shipping Act of 1876 stated the owner's duty towards seamen as requiring only the use of "all reasonable means" to "insure the seaworthiness of the ship."

After 1902 we find a number of cases exonerating shipowners from responsibility for the negligence of their masters or mates, because that negligence had not

rendered the vessel unseaworthy. Tropical Fruit S. S. Co. v. Towle, 5 Cir., 1915, 222 F. 867; John A. Roebling's Sons Co. v. Erickson, 2 Cir., 1919, 261 F. 986.

The results of these cases appear to have prompted remedial legislation. In 1915, Congress, perhaps misconstruing the Osceola case as merely an application of the fellow servant rule, passed a statute stating that " 'seamen having command shall not be held to be fellow servants with those under their authority.' " 38 Stat. 1164, 1185. In Chelentis v. Luckenbach S. S. Co., 1918, 247 U.S. 372, 38 S.Ct. 501, 503, 62 L.Ed. 1171, this language was held not to alter the maritime law. There followed the enactment in 1920 of the Jones Act, in effect giving the seaman a remedy for the negligence of the shipowner or other members of the crew, whether or not the negligence resulted in making the vessel unseaworthy.

After the enactment of the Jones Act, therefore, actions could be brought either for unseaworthiness or simply for negligence. But there is very little indication that any recovery could be had in an unseaworthiness action which could not be had as well in an action for negligence. For it was generally held that the seaman had to prove negligence to prevail in an unseaworthiness action. The Henry B. Fiske, D.C.D.Mass.1905, 141 F. 188; Burton v. Greig, 5 Cir., 1921, 271 F. 271, although there is a dictum to the contrary in Rainey v. New York & P. S. S. Co., 9 Cir., 1914, 216 F. 449, L.R.A.1916A, 1149. Storgard v. France & Canada S. S. Corp., 2 Cir., 1920, 263 F. 545, 547, left the question ambiguous, saying that the owner's duty was "to furnish and maintain equipment * * * *at least* free from defects known or which ought to be known." (Italics supplied.) If equipment had to be free from other defects as well, then the owner's duty would apparently be an absolute one.

The question was finally set at rest in 1922 when the Supreme Court, in Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927, stated that a shipowner could have been held liable, without any showing of negligence, for unseaworthy conditions existing when the vessel left her home pier. This rule was derived from an established line of cargo cases holding shipowners absolutely liable to shippers for the unseaworthiness of vessels at the outset of the voyage. The application of the cargo rule to seamen was apparently made without discriminating between the difference in the position of a shipper and that of a seaman vis-a-vis the shipowner: the shipper pays for the transportation of the cargo; the seaman does not pay for his passage; and the common law rule is that employers—apart from workmen's compensation laws—are not generally regarded as insurers of the safety of the places in which their employees work. It might therefore have been said that it is one thing to imply a warranty of seaworthiness to a shipper, but quite another to imply such a warranty in favor of a seaman. Nevertheless, and although since 1936 the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., has cut down the shipowner's duty to cargo-owners to one of using due care to furnish a seaworthy vessel, the rule of Carlisle has become firmly embedded in American admiralty law, and has enjoyed a liberal construction and expansion in a number of directions. See, for example, Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143—extension of unseaworthiness doctrine to longshoremen and repairmen; The Rolph, 9 Cir., 1924, 299 F. 52; Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515; Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800, affirmed, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143—unsatisfactory working conditions held to be within the seaworthiness doctrine, although the vessel

itself and her appliances were seaworthy —and Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, where recovery was allowed under the unseaworthiness doctrine for defective appliances temporarily brought on board by an independent contractor for use by him in the performance of his duties.

The foregoing survey will suffice to suggest some of the problems that would arise in undertaking to extend the absolute liability doctrine to conditions arising *after* the vessel has begun her voyage. Even in its existing scope that doctrine departed from the original general maritime law—still apparently the law of England, see Vaughan v. Sir R. Ropner & Co., Ltd., 80 Lloyd's List L.R. 119 (1946) (C.A.); Latham v. Ross & Marshall, Ltd., 80 Lloyd's List L.R. 346 (1947) (C.A.)—which grounded the seaman's remedy for the employer's failure to provide a safe place to work upon negligence. Its extension to conditions arising after the voyage has commenced would not alone be a further departure from the original maritime law and a departure from apparently commonly accepted notions as to the limits of the present American doctrine, but would also further strain the analogy of the cargo cases, where the duty of the shipowner has been stepped down to one to use due diligence to prevent the existence of unseaworthy conditions both before and after the vessel has commenced her voyage. Moreover, while the vessel is at her home port the owner has opportunities—not always, or to the same extent, available after the voyage starts —to correct dangerous conditions aboard his ship. And beyond that, to hold the shipowner absolutely liable for unseaworthy conditions created by perils of the sea would seem to be harsh. Further, the matter may be one which is better dealt with by legislation than by the courts, in light of such questions as whether an extension of the shipowner's absolute liability should be accompanied by some kind of protection against excessive jury verdicts, as for example is afforded by workmen's compensation laws.

To these considerations there are, of course, opposing ones. It may be said that the courts, having engrafted the absolute liability rule onto the early maritime law, should not now hesitate to give the rule this further extension, especially in light of the liberal treatment they have accorded it in other directions and the way in which the special lot of seamen has long been viewed. And it could be forcefully argued that there are no compelling reasons against extension of the rule. It might be claimed that from the point of view of the shipowner there is little real difference as far as the opportunity to correct defective conditions is concerned, since being already absolutely liable for defects existing at the start of the voyage even though he had no reason to suspect their existence, he is sometimes held liable on account of defects which he has had no real opportunity to correct. From the point of view of the seaman, it may be asserted that before the voyage he has a chance not to sign on the vessel, whereas once at sea he must stay with her, and that therefore it would seem anomalous for the seaman to receive less protection from the shipowner after giving up his most effective means of protecting himself. And it could be urged that extension of the rule is dictated by sound reasons of public policy—see The H. A. Scandrett, 2 Cir., 1937, 87 F.2d 708—and that in any event the rule should be extended to cover unseaworthiness arising at a port of call.

We express no opinion as to which side of the line the weight of such opposing considerations falls. We simply say that the complexity of the question is such as to persuade us that it should be left open for decision in a case where there is no escape from the necessity of deciding it. We therefore turn to the other grounds which lead us to remanding the case.

The duty of a shipowner to use due care to maintain the seaworthiness of his vessel after she commences

**16**

her voyage is "non-delegable." See Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Henry Gillen's Sons Lighterage v. Fernald, 2 Cir., 1923, 294 F. 520; Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800, affirmed, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. In Ives v. United States, 2 Cir., 1932, 58 F.2d 201, 202, our Court said: "The *nondelegable* duty to use due and reasonable care to make and keep the ship seaworthy, as well as her appliances, was upon the owners during the voyage." (Italics supplied.) This means that when the respondent delegated to an outside contractor the job of making the defective ladder seaworthy, it became chargeable with that contractor's negligence, if any, in failing to do the work properly. Hence if the negligence of this contractor was the proximate cause of Dixon's injuries the respondent would be fully liable, assuming for the moment the defenses of assumption of risk and contributory negligence to be inapplicable. We do not consider the libelant's election to rely on unseaworthiness rather than negligence to be an obstacle to recovery on this ground. We interpret his counsel's statement in that regard to mean no more than that the libelant was renouncing his original Jones Act claim. This disclaimer should not be stretched to include the abandonment of any claim of negligence as an element of his unseaworthiness action.

If the libel may be maintained on the basis of negligence in creating an unseaworthy condition, we must then consider (1) the effect of the respondent's defenses—assumption of risk, the nature of Dixon's duties, and contributory fault—and (2) the question whether negligence of the repairmen was adequately established below.

■ The lower Court held assumption of risk to be no defense because it found that Dixon had no reason to believe that the upper rungs of the ladder were in a dangerous condition, and also because as a matter of law the defense was invalid. We think both grounds were correct. As to the first, our reasons for sustaining it will appear from what we say in a moment upon the issue of contributory negligence. As to the second, the American courts have uniformly refused to allow assumption of risk as a defense to a seaman's action for injuries under the general maritime law. See discussion in The Arizona v. Anelich, 1936, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265. Hence, even though it was part of Dixon's duty to check the ladder and he had proceeded to the job with actual knowledge of the dangerous condition of the upper rungs, the shipowner could not have said that Dixon thereby assumed the risks involved. See Becker v. Waterman S. S. Corp., 2 Cir., 1950, 179 F.2d 713. A *fortiori* the respondent may not say that Dixon assumed the risk when at most he was only sketchily warned of the possible dangers involved. The only question can be as to whether the amount of the recovery should be mitigated by reason of contributory negligence in descending the ladder instead of using other means to check it. See The Arizona, supra.

Cases such as Walker v. Lykes Bros. S. S. Co., 2 Cir., 1952, 193 F.2d 772; Great Northern Railway Company v. Wiles, 1916, 240 U.S. 444, 36 S.Ct. 406, 60 L.Ed. 732, and other cases of the same tenor which the appellant cites, are in no way inconsistent with the rule that assumption of risk is not a defense or comparable to the situation before us. Those cases are only instances of the firmly established rule that an employee may not recover against his employer for injuries occasioned by his own neglect of some independent duty arising out of the employer-employee relationship. Their result turns really not upon any question of "proximate cause," "assumption of risk" or "contributory negligence," but rather upon the employer's independent right to recover against the

employee for the non-performance of a duty resulting in damage to the employer, which in effect offsets the employee's right to recover against the employer for failure to provide a safe place to work. Such cases are quite inapposite here. Dixon was not guilty of any breach of duty to his employer.

We come next to the question of whether Dixon was contributorily negligent. We accept the lower Court's finding that Dixon was informed by the second mate, Nasta, that other rungs of the ladder, beyond the three originally damaged, had been found to require repair; that the originally damaged rungs had been repaired; and that it was unknown to Nasta, the master and Dixon whether the additional rungs had been repaired. We shall also assume—even though the findings on this point are not wholly clear—that Dixon understood that the master's order to "check the ladder" meant the whole ladder, and not merely the three originally damaged rungs as Dixon testified. Even so—and having in mind that there were other ways of testing the ladder available to Dixon—we are not prepared to say that the lower Court should not have found that Dixon was justified in acting as he did. Dixon had descended the ladder safely twice before on the same day. Repairmen are supposed to make things better, not worse, and Dixon should not be held bound to have guessed that a poor job of repair had been done. Except for the three bottom rungs, Dixon had observed nothing wrong with the ladder before the repairmen got on the job, and he might have thought that the trouble with the top rungs had been defects which had not been serious enough to attract his attention before. Even if he might have suspected that the repairmen had made things worse than they were beforehand, we still do not think he should be taken to have acted improperly. For he might reasonably have assumed that all that had happened was that some of the upper rungs had been slightly loosened in the repairing of the lower ones so as to require some tightening before the job could be regarded as finished, but that his inspection could safely be made by descent. And if the repairmen had damaged the ladder to the extent that descent was dangerous, Dixon might well have assumed that they would have left a warning that the ladder was unsafe, or fixed at least enough of the rungs so that one could descend without falling. Finally, it should be observed that both the master and Nasta, whose knowledge of the ladder was the same as Dixon's before the accident, started to descend the ladder to come to Dixon's aid, until Dixon warned them off.

While it is true that Dixon was not as cautious as he might have been, we are unable to say that he was unreasonably incautious, so as to justify us in overturning the lower Court's finding that he was not contributorily negligent.

We do not think, however, that it is possible, on this record, to treat the issue of negligence as having been adequately disposed of below. It is true that in its opinion the lower Court stated: "The parties appear to be in agreement as to the cause of the upper rungs' defects. In replacing the three lowest rungs, the repairmen cut the new rungs too long and by forcing them in had spread, or sprung, the two uprights to such an extent that the welds on some of the upper rungs were loosened." But we think that this may not be accepted as a sufficient finding that the contractor was negligent, because although the respondent did concede that the ladder was in an unsafe condition at the time of the accident, we are not satisfied that it also intended to concede that the cause of this condition was the failure of the repairmen to do their job properly.

All the record shows is this: On the direct examination of Dixon his counsel elicited the following:

"Q. Can you explain what caused these rungs to give way? A. Well, I have an opinion.

"Q. Give us your opinion? A. My opinion is that they cut the rungs too

long; the three bottom rungs, they cut them too long and put them in on an angle, which was between the two uprights, put them in on an angle, and then banged them down until they come level, and when they did that, they sprung the uprights out and caused the loosening of the welds on these other rungs above. That's the only thing—that's my opinion."

While the failure of counsel for the respondent to object or remonstrate against this testimony, taken together with the circumstances of the accident and the concession that the ladder was unsafe, might, if nothing more had happened, conceivably be taken as an acknowledgment that the cause of the defective condition of the ladder was as Dixon had testified, it appears from the cross-examination of Dixon that counsel for the respondent did not intend his initial silence to convey that meaning. For part of his cross-examination was directed to trying to show that the giving away of the uppermost rungs under Dixon's weight could not have been attributable to the spreading of the sides of the ladder.

Accordingly, we conclude that the case should be remanded for further findings, and if necessary, additional evidence, as to the cause of the defective condition of the ladder, with instructions to the District Court to enter judgment in favor of the libelant for the amount of damages already determined, if it is found that the ladder's condition was due to negligence for which the respondent would be liable in accordance with this opinion. Since further proof may be taken on an admiralty appeal in such manner as the court may direct— see Admiralty Rule 45, 28 U.S.C.A.—we may properly remand the case to the District Court for this purpose.

Remanded, with reservation of jurisdiction, and with permission to the parties to present further argument on the issues involved if further consideration of this appeal should be necessary.