George C. SAUNDERS, Appellant,

v.

POOL SHIPPING CO., Ltd.,
Appellee.

No. 15932.

United States Court of Appeals
Fifth Circuit.

June 28, 1956.

Arthur Roth and Gerard Ehrich, Rassner, Miller & Roth, Miami, Fla., for appellant, Jacob Rassner, New York City, on the brief.

Dwight Sullivan, Miami, Fla., for appellee, Scott, McCarthy, Preston, Steel & Gilleland, Miami, Fla., Kirlin Campbell & Keating, New York City, of counsel.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Saunders, a longshoreman, claimed severe brain damage from an occurrence of October 16, 1950, when a section of wood pipe sheathing, covering some pipelines in the hold of the S. S. Cedarpool, suddenly broke away hitting him on the head. Contending that the award was woefully inadequate, he now appeals from the judgment in his favor on the jury verdict for $5,000 damages.

Apparently recognizing that on the issue of the nature, extent and monetary compensability of the injuries themselves, he is faced with the typical situation in which the jury, in the wisdom which gives the institution its historic reliability, declined to see these medical consequences through either black or rose-colored glasses, the attack is an oblique one. Starting with the somewhat unique position that he was either grossly *over* [1] or *under* compensated, he contends

---

1. A rhetorical, academic gesture since defendant acquiesced and did not appeal. The plaintiff thus runs no chance of losing his verdict.

that the low verdict was the by-product of give and take, compromise and adjustment on the issue of liability which, as an apparent paradox, might have seemed dubious to the jury, but which to a trained Judge was clear as a matter of law—so clear, indeed, that a verdict on it ought to have been (as requested) directed for the plaintiff.

This extraordinary claim mirrored trial tactics equally bold. In the opening moments the plaintiff formally abandoned his count for negligence, stood alone on unseaworthiness and made his whole case on it in the twinkling of an eye by offering an extract from the vessel's log [2] which both affirmed the occurrence as a fact and negatived knowledge or circumstances which would explain it.

The defendant shipowner, conscious as it must have been of the awesome obligations of seaworthiness, contended that contemporary developments in this field, disturbing and rapid as they might be, had at least left the occasional defense that the failure of the gear or appliance —and from which failure the unseaworthiness, i. e., unfitness, is established —was from a non-normal use. Thinking that the jack staff ought only to be fit to fly the ensign and not to moor the ship, the defendant asserted that in this vacuum of cause, naught appeared as to how

or why the sheathing broke off and the minimum required, therefore, was some proof that it failed under usual, anticipated use. This led it to counter the plaintiff's motion for directed verdict with one of its own.

■■ We decline to rule one way or the other on these counter contentions for the issue was resolved in plaintiff's favor by the jury's verdict. If it was error, the error on liability was harmless,[3] and the plaintiff cannot complain that the jury saw so plainly what he thought should have been so obvious to the Judge.

We suppose that, in life's endless variables which find their way into judicial proceedings, there have been, may or will be, cases in which submission of the liability issue after refusal of a plaintiff's motion for peremptory instruction on it can produce a result manifestly unfair and requiring decisive correction[4] on appeal. But we would think that at least two things would first have to coincide: first, a fact situation in which, on applicable and well-understood principles the liability was demonstrably patent with no genuinely arguable doubt; and, second, a strong showing from the peculiar facts of the case, the setting of the trial, its general atmosphere and all other significant developments short of

2. "Entry: At 14.20 hrs. on October 16th, 1950, two longshoremen engaged in discharging cement cargo from No. 2 hold were injured when struck by a section of wood pipe sheathing which broke adrift from the starboard side of the forward bulkhead and fell onto the tank top.

"The injured men were immediately removed to hospital by ambulance.

"The section of sheathing had been secured to the bulkhead by three welded steel brackets which were fractured, the broken ends showing clean and appearing to be fresh breaks. No evidence could be obtained as to the cause of the brackets being fractured." This was signed by Master and Chief Officer.

3. We will not, may not, reverse for harmless error, F.R.C.P. 61, 28 U.S.C.A. and see these typical cases in which admitted or assumed errors in the submission to the jury are held to have been harmless since cured by the verdict, Taubman v.

Allied Fire Ins. Co. of Utica, 4 Cir., 160 F.2d 157; W. E. Hedger Transportation Corp. v. United Fruit Co., 2 Cir., 198 F. 2d 376, certiorari denied 344 U.S. 896, 73 S.Ct. 275, 97 L.Ed. 692; Gulf Refining Co. v. Fetschan, 6 Cir., 130 F.2d 129; Emerman v. Cohen, 2 Cir., 199 F. 2d 857; Crowe v. Gary State Bank, 7 Cir., 123 F.2d 513; Dow v. United States Steel Corp., 3 Cir., 195 F.2d 478; see also, Atlantic Coast Line R. Co. v. Johnson, 5 Cir., 199 F.2d 750, on rehearing, 5 Cir., 200 F.2d 619; Cagle v. McQueen, 5 Cir., 200 F.2d 186; Shell Oil Co. v. Kamper, 5 Cir., 111 F.2d 569; United States v. Classified Parking System, 5 Cir., 213 F.2d 631.

4. Plaintiff relies heavily on Sinovich v. Erie Railroad Co., 3 Cir., 230 F.2d 658, as illustrating reversal when "low" damage award may have resulted from some extraneous matter (there inadmissible evidence).

invading the secrecy of the jury deliberations, which would lead the Appellate Court to conclude on the total record that by the combination of the two factors the jury's verdict on *amount* had been adversely affected.

This is no such case on either count. In the analysis we can even assume that the plaintiff was right and the Judge wrong on the issue of seaworthiness. If the Judge's action was wrong, it was not not unreasonable, for even though, in contrast to the layman who is only *presumed* to know the law, the Judge must ultimately exceed the presumption to a state of knowledge, he is nevertheless, at least up to the final agony of decision, entitled to his doubts and uncertainties—indeed, these hesitations, these responses to the pleas of advocacy are the very essence of deliberation. Who is to say, in this field of unseaworthiness, ap-

plied now so widely to areas and persons long understood to be without its orbit and on concepts thought by many to be a surprising departure [5] from traditional standards, that a case on the narrow proof of this record was made out positively as a matter of law?

Moreover, the use of any such juridical retrospective radarscope to hold a District Judge, at each and every stage, to the prescience of an infallible oracle of the law would be to destroy the effective advantage of the rules which permit him to take a second look at law and fact. F.R.C.P. 50(b), 28 U.S.C.A. We should, as we always do, encourage, not discourage, the fullest use of this flexible mechanism which preserves [6] by one trial, the ultimate right of jury and the ultimate right of legal ruling on the sufficiency of the evidence. See, Fratta v. Grace Line, Inc., 2 Cir., 139 F.2d 743;

5. The plaintiff-appellant is the first to recognize this for in his brief here he states: "That the legal question of unseaworthiness necessarily presented a controversial issue cannot be denied, for that question has been one that even our most learned courts have found most perplexing.[2] * * * [The cited footnote 2 is]:

"[2]Only as recently as February 7, 1955, our present Supreme Court Justice John W. Harlan in the case of Dixon v. United States [2 Cir.], 219 F.2d 10, stated that the question of seaworthiness was still unsettled.

"The decision in the cases of Seas Shipping Co., Inc. v. Sieracki [328 U.S. 85], 66 S.Ct. 872, [90 L.Ed. 1099]; Boudoin v. Lykes Bros. Steamship Co., Inc., [348 U.S. 336], 75 S.Ct. 382 [99 L.Ed. 354]; Pope & Talbot v. Hawn, [346 U.S. 406], 74 S.Ct. 202 [98 L.Ed. 143]. Porello v. United States, [2 Cir.], 153 F.2d 605, affirmed in part, reversed in part, [330 U.S. 446], 67 S.Ct. 847, [91 L.Ed. 1011]; Petterson v. Alaska Steamship Co., Inc., [9 Cir.], 205 F.2d 478, affirmed without opinion [347 U.S. 396], 74 S.Ct. 601 [98 L.Ed. 798]; changed the Court's interpretation of unseaworthiness as theretofore expressed in the case of Grasso v. Lorentzen [2 Cir.], 149 F.2d 127, certiorari denied, 326 U.S. 743 [66 S.Ct. 57, 90 L.Ed. 444]; Gallagher v. United States Lines Co., 2 Cir., 206 F.2d 177, 179, certiorari denied, 346 U.S. 897, [74 S.Ct. 221, 98 L.Ed. 398], and to the

same effect Lopez v. American-Hawaiian S.S. Co., 3 Cir., 201 F.2d 418, certiorari denied, 345 U.S. 976 [73 S.Ct. 1125, 97 L.Ed. 1391], see discussion and criticism in 102 U. of Pa.L.Rev. 402. Seaworthiness, under Mahnich v. Southern Steamship Co., 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561], and [The] Osceola, 189 U.S. 158 [23 S.Ct. 483, 47 L.Ed. 760], includes the adequacy and competency of the crew. Keen v. Overseas Tankship Corporation, 2 Cir., 194 F.2d 515, certiorari denied Overseas Tankship Corporation v. Keen, 343 U.S. 966 [72 S.Ct. 1061, 96 L.Ed. 1363]. Yates v. Dann, D.C.Del., 11 F.R.D. 386; cf. The Rolph, 9 Cir., 299 F. 52, certiorari denied, Rolph Navigation & Coal Co. v. Kohilas, 266 U.S. 614 [45 S.Ct. 96, 69 L.Ed. 468].

"The prevailing opinion as to unseaworthiness in Cookingham v. United States [3 Cir.], 184 F.2d 213, was recently rejected by the Court of Appeals for the Second Circuit in Poignant v. United States, 225 F.2d 595, which case in turn approved the dissenting opinion in Cookingham case (supra), and also settled the question left open in the Dixon case (supra)."

6. If peculiar circumstances suggest any possible "contamination" of the award fixing the amount, the Court has ample means to guard against this, e. g., use of special questions or interrogatories either alone or in connection with the general charge under F.R.C.P. 49.

Craighead v. Missouri Pacific Transp. Co., 8 Cir., 195 F.2d 652.

■ Nor does it meet the second factor. This is so because the medical evidence affords an ample basis for the moderate verdict. It was, in the first place, the typical jousting of experts called not to treat but to testify, frequently tilting at professional windmills with much of it in the heady heights of the psychic dialectic.[7] It ws substantially agreed that at the time of the trial five years after the accident, the plaintiff was in a bad way from mental disorders that seriously affected his general personality and made it likely that he would have to receive long and expensive treatment in and out of hospitals or institutions. But this was only part of the story. Was it caused by the blow on the head? Was it the result of organic, neurological damage? Or was it a mental disorder not traceable to physical, i. e., organic damage? Almost forgotten in this forensic exercise was the actual treatment given by, and diagnosis of, the physicians whose aim was to treat him in 1950. Their reports reflected an admission with a provisional diagnosis of concussion but, on discharge four days later, this was changed to lacerations of the scalp. Within a month he had returned to work although he did have a history of headaches, occasional dizziness and in the intervening years saw doctors on several occasions.

The plaintiff's expert insisted that the condition was from organic brain damage and relied heavily on a high protein count in two recent spinal taps to substantiate it. The defendant's experts held the view that his condition was paranoid schizophrenia which, as they saw the Freudian light, could not be, and never was, caused by injury. Agreeing that the protein count was a significant (although not infallible and susceptible of cause from non-brain conditions) factor, they ruled it out as decisive in the face of other tests (e. g., electroencephalograms, Rohrschach, Bender-Gestalt, the "Face-Hand" test, etc.) which, while they may have left the jury in the clouds, let the doctors descend long enough to conclude firmly that the neurological findings were negative, i. e., no evidence of organic brain damage.

■ Here was a struggle of complex, competing theories couched by protagonists in the weird jargon of their calling. It is the paradox of the jury system that for the one case, for that time and for that occasion, all conflict, no matter how technical or profound, ceases and resolu-

---

7. E. g., the plaintiff's expert: "In this case it has to do with the diagnosis. If it is diagnosed as schizophrenia— * * * That is what these symptoms indicate. * * * There is no exactly known cause for that condition. However, we have also the fact that head injuries do produce mental conditions and it is possible that the mental condition that can be produced can be similar to schizophrenia. That is, the type of symptoms can be similar, but in such an instance that condition can be called a traumatic psychosis or a mental illness due to an injury with schizophrenic types of symptoms. * * * He has a traumatic psychosis and schizophrenia, but that would seem to make a paradox of a man having two conditions. * *."

"A. The schizoid personality. Isn't what you mean a pre-schizoid personality?

"Q. Yes. That is just a difference of degree, is it not, Doctor? A. No, it's not. Some people can have what is described as a schizophrenic personality and never have schizophrenia. * * *

"Q. You say some have a schizoid personality? A. Yes, what we call a schizoid personality or somewhat like a schizophrenic personality.

"Q. Is it fairly common to see in a person like that a development of a schizophrenic personality? A. I wouldn't say common. I [the doctor himself] have a schizoid personality, but I don't have schizophrenia." [Italics added]

Plaintiff's counsel could not resist the temptation to match wits in this important but ofttime baffling field:

"Q. Did you find any catatonic signs? A. No.

"Q. Tell the jury what catatonic signs are.
* * * * *

"Q. Did you find any hebephrenic signs? A. No, sir.

"Q. Tell the jury what that is. A. Hebephrenia is—I [defendant's expert] haven't had this since medical school.

"Q. You are getting it now."

tion comes by the verdict. That was the jury's function here and that is what they did. By its verdict, it presumably chose the theory that this permanent and adverse condition was not caused by the injury. There was abundant basis for it, and contrary to the plaintiff's suggestion, the $5,000 allowance was no giveaway since this and other evidence gave them ample basis for awarding some damage for dizziness, headaches, similar discomfort, loss of earnings and similar factors which the jury could conclude came from the accident.

We consider as a pure afterthought the belated attempt, to find the cause of this "low" damage allowance, to pin it now on a few bits of testimony concerning the cost of hospitalization and the suggestion in the answers that it might be available to him free of cost. The evidence, if inadmissible, was but seldom objected to during the trial, and its unimportance in the total setting of the case is spectacularly demonstrated since no point was made of it in the Motion for a New Trial, in the Statement of Points to be covered on the appeal, nor as Points in the appellant's brief. The whole thing seems to be merely an effort to work a good case, Sinovich v. Erie Railroad Co., supra, overtime.

Affirmed.