CHESAPEAKE & OHIO RAILWAY
COMPANY, Appellant,

v.

Zernie NEWMAN, Jr., Appellee.

No. 12880.

United States Court of Appeals
Sixth Circuit.

April 16, 1957.

806

Russell V. Bleecker, Cleveland, Ohio, for appellant.

J. Harold Traverse, Cleveland, Ohio, for appellee, Victor M. Todia, Cleveland, Ohio, on the brief.

Before SIMONS, Chief Judge, and ALBERT LEE STEPHENS and McALLISTER, Circuit Judges.

ALBERT LEE STEPHENS, Circuit Judge.

Appellee, Zernie Newman, brought this action against appellant, Chesapeake &

Ohio Railway Company, under the Jones Act,[1] for injuries sustained in the course of his employment as third mate aboard appellant's Carferry Pere Marquette 21, on December 22, 1954. The ship was docked at Ludington, Michigan, awaiting cargo and sailing orders. Many of the officers and crew members lived in Ludington and were on shore leave at their homes. Appellee Newman left the vessel for his home early in the afternoon with orders to return at 4:00 P.M. and to relieve the second mate. Newman returned to the ship as ordered and was at that time informed by the second mate, whom he was relieving, that departure orders for the ship had been fixed for 7:00 P.M. that night. Apparently around 6:30 P.M. Newman became apprehensive as to the lack of preparations by shore personnel to get cargo ready for the vessel, and therefore decided to make inquiry by telephone as to appellant's plans for sailing of the ship and then to phone the master of the ship at his home.

Newman attempted to use a telephone in a booth on the dock near the vessel but found it in use by someone. He waited for the booth to empty for a few minutes but decided to go to the marine shore office of the appellant where another telephone could be used. The office was about 150 feet away from the ship. Newman started walking along the pathway customarily used by the ship's personnel who went ashore on ship's business, or who used it for ingress to or egress from the vessel. There was packed snow and ice on the surface of the pathway which apparently had been visible earlier in the day. Newman had gone a short distance when he came upon an incline that was icy, and when he continued down the incline, he slipped and fell and seriously injured his left knee. The extent of the injury we will later discuss.

The site ashore where the accident occurred was owned, maintained and controlled by the appellant vessel owner. The shoreside activities were both rail-road business and marine business. The total surrounding area owned by appellant was approximately ninety acres.

Newman subsequently brought this action against appellant under the Jones Act, alleging negligence on the part of appellant in 1st, failing to provide a safe place to work; 2nd, failing to remove ice and snow from the area involved or otherwise to render the ice and snow innocuous; 3rd, failing to provide sufficient light at the area where plaintiff fell; 4th, permitting the area to remain in a slippery, dangerous and unsafe condition. A trial by jury was had on February 27, 1956. The jury returned a verdict in favor of appellee Newman for $60,000.

## The Appeal

Appellant premises its main point on the assertion that any injury which Newman suffered was the proximate result of his own negligence and no negligence was shown on the part of the appellant ship owner. Appellant argues curiously that Newman was the temporary master of the ship and had a special duty, personal to him, to correct dangerous conditions ashore. But when the issue is whether or not appellant was negligent, appellant asserts that it was free of negligence "on the simple ground that it was a physical impossibility for the defendant to maintain the property involved free of snow and ice in the winter season."

Appellant admits that assumption of the risk is no defense to an action brought under the Jones Act and further agrees that the doctrine of comparative negligence is applicable. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Imperial Oil, Limited v. Drlik, 6 Cir., 234 F.2d 4; Carter v. Schooner Pilgrim, 1 Cir., 238 F.2d 702.

■ Because of the insistence of appellant in arguing that Newman is not to be treated as an ordinary seaman, and be-

1. Jones Act, 41 Stat. 1007 (1920) 46 U.S.C.A. § 688.

cause some confusion appears in decided cases upon the point, we find it appropriate to discuss several cases dealing with persons aboard ship other than ordinary seamen. The confusion relates to the legal effect of a finding or allegation that a master or officer of a ship has breached a duty owing by him to his employer. In Walker v. Lykes Bros. S. S. Co., Inc., 2 Cir., 1952, 193 F.2d 772, it was indicated that where the master of a ship contributes to his own injury by reason of a breach of his supervisory duties owed to his employer, the breach which contributed to the injury is not merely "contributory negligence" resulting in mitigation of damages under the Jones Act but constitutes a bar to the master's recovery. The First Circuit, in Boat Dagny, Inc., v. Todd, 1955, 224 F. 2d 208, 211, disagreed with "this refinement between the two species of contributory fault" and held that any negligence of the master would not necessarily be a bar to recovery but would only be useful in determining comparative negligence. However, the Second Circuit later, in Dixon v. United States, 1955, 219 F.2d 10, held that Walker v. Lykes Bros. S. S. Co., Inc., was only an exposition of the rule that an employee may not recover against his employer for injuries occasioned by his own neglect of some independent duty arising out of the employer-employee relationship.[2] While we do not disagree with the reasoning used in Dixon v. United States, supra, we are of the opinion that a more complete solution of the problem, where there is some breach of duty owing by an employee, is to base the result on causation. The explanation set out in Dixon v. United States, supra, does not encompass the factual situation involving a breach of duty by the employee plus other combining or contributing negligence on the part of the employer. If the breach of duty owed by the employee to the employer was the sole and proximate cause of his injury, then recovery would be barred, not because of contributory negligence, but rather because no negligence of the employer's was in the chain of causation. But if the employee was injured because of his employer's negligence which combined with his own neglect of duty to his employer, then the doctrine of comparative negligence would be applicable.

In the instant case, there was clearly sufficient evidence in the record to constitute jury questions whether (1) Newman was solely negligent, (2) the employer was negligent, (3) both were negligent. Newman testified that the place where he fell was slippery due to ice, that the surface was sloping, that there was inadequate illumination and that there was no salt, sand, cinders or other abrasives used by defendant-appellant to provide a safe walkway to the marine office from the ship. Newman was corroborated in this testimony by Roy Frase, the wheelsman from the vessel, who responded to his call for help and who was the first person to reach him after his fall. We find without merit the contention of the employer, not that the icy condition did not exist, but that the employer owed no duty to keep the *entire ninety acres* free of snow and ice because it would be impossible to do that[3] It was not claimed that the em-

2. The Fourth Circuit in Mason v. Lynch Brothers Company, 1956, 228 F.2d 709 noted the conflict in reasoning between the Second Circuit and First Circuit, but found it unnecessary to resolve the differences because it was therein held that the injured party was to be treated as a seaman rather than a master of a vessel.

3. For cases dealing with somewhat similar problems, see: Mercado v. United States, 2 Cir., 1950, 184 F.2d 24; Buckeye S. S. Co. v. McDonough, 6 Cir., 200 F.2d 558, affirming McDonough v. Buckeye S.S. Co., D.C., 103 F.Supp. 473; Buch v. United States, 2 Cir., 220 F.2d 165; Mason v. Lynch Brothers Company, 4 Cir., 228 F.2d 709; Marceau v. Great Lakes Transit Corporation, 2 Cir., 146 F.2d 416; Bohannon v. United States, 2 Cir., 185 F.2d 678.

ployer had such a duty, but rather that he had the duty of keeping open a reasonably safe passage-way of the 150 feet from the ship to the marine office.

We do not find it error that the jury found the employer negligent in his duty to the employee. We note the evidence in part in the margin.[4]

4. Appellant's witness Ray Thomsen, Superintendent of Steamships of the Chesapeake & Ohio Railway Company, in reply to a question as to whose responsibility it was for the safety of people in the area of the 150 foot pathway stated:

"We have never felt that in this area it was any different than any other part of the area."

Thomsen was then asked:

"Q. With the result you did nothing about it, is that what you mean to say? A. And the sand has been provided at those various places there for free use of whatever employee or whoever feels there is a condition he feels which is unsafe he can use the sand.

"Q. In other words, of your 15 to 20 people, shoreside employees as distinguished from those on the vessel, of your 15 to 20 shoreside employees, including yourself and including the safety man, Harris, it is left to anyone that sees something unsafe or slippery to go and find a shovel and go to the sand box and throw the sand on the slippery area on the shore in Ludington? A. There has never been anyone designated.

\*　\*　\*　\*　\*

"Q. You weren't leaving the care, the day-by-day supervision and inspection of the safety and maintenance of this land area all around there, you weren't leaving that haphazardly to a dozen different ship Masters and maybe three times as many Mates to see everything was right ashore, were you? A. Well, there is no one designated to watch the docks, as far as the shore force is concerned.

\*　\*　\*　\*　\*

"Q. You had sand there but no one to spread it, is that what you mean, no one designated with the responsibility, no one responsible for spreading it? A. There was no one designated with the fixed responsibility of spreading it.

The testimony of appellant's witness, John E. Burke, who stated that he was a Master of steam vessels with 27 years experience and was familiar with the harbor at Ludington, and the operation of car ferries out of that port, is very illuminating.

Cross-examination by Mr. Travers of Mr. Burke:

"Q. Now, when you are in a situation where the vessel owner also owns the dock and the area around the dock, and has offices there for shoreside employees, has a marine office for men that work there day after day, five days a week, as distinguished from men who are coming in and going out haphazardly at different times, different times of day or night, different times during the week, there is a custom and practice where the vessel owner has the shore employees see generally to the safety around the dock; that's true, isn't it? A. Yes, in some circumstances it is true.

"Q. Why, it is reasonable on its face, isn't it, Captain? A. Well, I would say yes, sir, if a ship came to a dock and was being worked by shoreside employees. I would say that the officer on watch had charge of the portions of the dock that was adjacent to the dock, but if the employees of the ship had to go beyond the adjacent part of the dock, I would say that the officers on the ship were in charge of that. For instance, even if the dock is owned by private owner.

"Q. Not the same one? A. By the same owner.

"Q. That is the one we are talking about. A. By the same owner, and it was unsafe for the crew to travel the officer on watch should do something about it he should forbid the men going ashore until the condition was rectified.

"Q. Exactly. But he wouldn't undertake to go ashore and grab a shovel and talk to the shore employees and tell them what to do? A. Absolutely, sir, he would go to the superintendent of the plant and file a complaint.

"Q. All right, he would do that, but he wouldn't do the work? A. He wouldn't do the work; he isn't allowed to do the work.

\*　\*　\*　\*　\*

"Q. Now, in this instance the vessel owner also owns and controls the property, we are told 90 acres of property, and I am only talking about some 150 feet from the marine office to the vessel, but they have a big tower there with a cluster of lights on it and one of those lights burns out, would you send one of your men from your ship to go and find a bulb some place and replace it on the tower? Why do you hesitate? Is there any doubt about the answer to that question? \* \* \* A. The answer is no.

Appellee additionally charged appellant with negligence in failing to adequately illuminate the spot where he fell. The place of the fall was approximately 75 feet from the dock lights and 140 feet from the marine office lights. But neither the dock lights nor the marine office lights illuminated the spot where Newman fell. Adjacent tower lights likewise did not light the spot. Appellant preferred to infer that since Newman knew the ice was there, he would have fallen even though it were daylight. But Newman testified that the accident would not necessarily have happened had it been daylight.

The evidence supports the inferential finding of negligence on the part of the employer in that it furnished inadequate lighting, failed to take steps to render the ice and snow innocuous and generally failed to provide a reasonably safe pathway to and from the ship to the marine office. The contention that the jury should not have been given the question as to whose negligence was the proximate cause of Newman's injury is meritless. The appellant cites our decision in Detroit, T. & I. R. Co. v. Banning, 173 F.2d 752, a case under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. That case is inapposite. There a brakeman sought recovery because muddy conditions in defendant's yard resulted in muddy boots causing him to slip and injure himself. Judge Miller, speaking for the Court, denied recovery to the brakeman, but in doing so stated that "reasonable steps must be taken to counteract or avoid the danger." In that case there was no evidence that reasonable steps were not taken, and it was further pointed out that the injured workman had ample opportunity to clean his boots prior to the accident. Other cases cited by appellant are either not in point or are clearly distinguishable

on their facts. Ouzts v. A. P. Ward & Son, Inc., D.C.Fla., 146 F.Supp. 733, is not in point since it was not a jury trial, and it was therein held that there was no negligence on the part of the employer and that the injury was caused by the sole negligence of the plaintiff.

Alleged Error In Charge To Jury

Appellant next argues that the Court erred when it refused to give the following charge to the jury:

"The law does not require the impossible. If you find that it was impossible for the defendant to keep its property at Ludington completely free of snow and ice, the defendant was not negligent and your verdict must be for it."

As heretofore indicated herein the facts of this case do not pose the point of the requested instruction. There is no claim that anybody had the duty of freeing the whole property from snow and ice. We find no error here, since the issue of negligence only involved the area where the accident occurred. Likewise under such a charge the jury would be unable to determine the existence of other acts of negligence alleged against appellant such as inadequate illumination of the pathway. Such a charge would also remove from the Jones Act the doctrine of comparative negligence.

Was It Error For The Trial Court To Charge The Jury That There Was *No Specific Issue* Properly Before It On The Subject Of Appellee Newman's Personal Responsibility For The Icy And Slippery Condition Of The Pathway?

In order to adequately understand this aspect of the case, we set forth in the margin the pertinent portion of the able trial judge's comments to the jury.[5]

5. "You will note that the defense outlined here in this answer is that the plaintiff knew the danger and assumed the risk and was himself negligent. No other defense appears in the answer and no other defense was given to you in the opening statement for the defense when they made their opening statement, and the opening statement which they made was the defendant's opportunity under the law to tell you what they expected to prove here.

We note initially that appellant refers to the point as a "specific defense" to an action under the Jones Act. As we have heretofore said, any evidence that appellant presented as to appellee Newman's dereliction of duty would not necessarily be a bar to the action but would only be applicable in determining whether or not Newman was contributorily negligent (which would reduce his damages under the comparative negligence theory), or in determining whether the alleged failure of appellee to perform his duty was the *sole and proximate cause* of his injury. The judge's instructions on this phase of the case were clear and adequately informed the jury that evidence of Newman's failure of duty would go to whether he was contributorily negligent.[6] But as to whether specific instructions as to such evidence were necessary in order to enable the jury to determine if Newman was solely negligent, we think it significant to note that in appellant's reply brief the statement is made:

"We have already stated our position to the effect that any injury suffered by the plaintiff was the result of his sole negligence; in other words, that the defendant was free from negligence. We assert this freedom from negligence on the

"It has been suggested in defense argument to you that the responsibility for the presence of this icy condition and the failure to use sand or salt to prevent it or obviate or cure it should be placed on this plaintiff on the theory that since the captain had left that ship that afternoon to cross this area and the first mate was making up a payroll, that the plaintiff became personally responsible as the one man in charge of the ship for not eliminating this condition. In fact, in this respect the plaintiff testified in answer to defense counsel's question, that if he had put men to work on such a project that his employer would quickly stop him for improperly running up its labor costs, because that was not their duty. The passage way traversed here between the ship and the office was 100 to 150 feet in length.

"I say to you as a matter of law that there is no issue properly before you on the subject of plaintiff having any personal responsibility for this icy and slippery condition. There is no such evidence before you which would require me to instruct you in that regard. No such claim was ever made in the answer, and no such claim was ever made in the opening statement. The only reason for my permitting evidence along this line was for whatever it was worth to you as bearing on the question of whether plaintiff knew of the presence there of ice and snow and whether plaintiff assumed the risk or had no alternative but to walk across that slippery area. You will recall from his own previous testimony it had already been apparent to him in the daytime, and, in any event, he knew there had been ice there. But you are not to decide, nor is such question legally before you or me, whether plaintiff himself had any personal responsibility as the temporary commander of the ship in the absence of other officers, personal responsibility for the presence of this ice, or for his personal failure to have it removed.

"I hope this clarifies that for you, because, ladies and gentlemen, I say to you again, this case is based on those pleadings and on the opening statements; and the opening statements and the pleadings definitely are based on the proposition of the plaintiff's allegations or claims the defendant was negligent toward him in four respects which I have read in detail, and the defense put up here by the defendant in its answer to the effect that they didn't know about this snow and ice, they didn't know how he was hurt or if he was injured it was his own fault and he assumed the risk in crossing it. That is all that is before you in the matter of issues in this case."

6. The trial judge did not use the word "contributory negligence," but rather said he allowed the evidence in for the jury's use "for whatever it was worth to you as bearing on the question of whether plaintiff knew of the presence here of ice and snow and whether plaintiff assumed the risk or had no alternative but to walk across the slippery area." The trial judge later explained to the jury what he meant when he used the term "assumption of risk." He in effect was using "assumption of risk" interchangeably with "contributory negligence," which he instructed the jury was to be used by them in arriving at comparative damages under the doctrine of comparative negligence applicable to the Jones Act.

simple ground that it was a physical impossibility for the defendant to maintain the property involved free of snow and ice in the winter season."

The above statement is the exact defense argued by appellant in its answer and opening statement. It is the theory on which the trial judge conducted the case and on which the appellee's counsel cross-examined the witnesses of appellant.

The trial judge went to great effort to point out to the jury that no claim was made in appellant's answer nor in the opening statement that appellee Newman had a personal responsibility to correct the icy and slippery condition. The judge further stated that there was not evidence before the jury which would require him to instruct it as to whose responsibility it was to correct the condition. It appears to us to be inconsistent that at the end of the trial and now on appeal for the appellant to argue that on the one hand the failure of Newman to correct the dangerous icy condition was the sole and proximate cause of his injury, while on the other hand to argue that as to *appellant's* duty to remedy the dangerous condition, it was a "physical impossibility."

We have closely examined the transcript of record and find no error in the instructions given by the trial judge nor error in the withholding of certain instructions or charges requested by appellant in the circumstances of this case. Was It Error For The Court To Refuse Appellant's Motion To Amend Its Answer, After The Case Was Submitted To The Jury, So As To Raise "A Further Separate And Affirmative Defense" That Appellee Was Responsible For Maintaining The Area Where The Appellee Fell, In A Reasonably Safe Condition?

■■ It is clear that the case was tried without pleading or evidence in support of the proposed new issue. Rule 15, 28 U.S.C.A. Federal Rules of Civil Procedure is not applicable under the facts of this case. The trial judge stated: "You only raised it [the defense] in a few questions. In other words, it was never raised as far as I am concerned, hasn't been raised although you are raising it now; it is too late."

Rule 15 (b) of the Federal Rules of Civil Procedure,[7] under which appellant sought to amend its answer, clearly is applicable only when as stated, in the rule, the amendment is to "conform to the evidence." It is also stated in the rule that the issue or issues sought to be included in the amendment must have been "tried by express or implied consent of the parties." In the instant case the Court did not find sufficient evidence which required an amendment so that the pleadings would conform to the evidence. The trial judge inferentially, if not specifically, did not find any "express or implied consent of the parties" as to any issue tried but not pleaded. It is clear that throughout the trial the parties well understood what the issues were, and the issue proposed by the amendment was not one to conform the pleadings to the proof but to inject a

7. Rule 15, 28 U.S.C.A. Federal Rules of Civil Procedure.
    " * * * (b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

new and different issue as to which different and additional evidence would be relevant. Hart v. Knox County, D.C., 79 F.Supp. 654, 653; Apex Smelting Co. v. Burns, 7 Cir., 175 F.2d 978; Trantham v. Canal Insurance Co., D.C., 117 F.Supp. 241 affirmed 6 Cir., 220 F.2d 752. The trial court is vested with sound discretion in granting or refusing leave to amend, and under the circumstances in the instant case, we find no abuse of that discretion. Carrol v. Funk, 9 Cir., 222 F.2d 508.

### Was It Error For The Trial Court To Exclude Testimony To Show That No Previous Accidents Had Occurred As A Result Of Icy Conditions?

Appellant asked its witness Thomsen, Superintendent of Steamships at Ludington, whether, during his thirty-two years as an employee of appellant, he had ever had a prior claim for injuries sustained by falling on ice in the area of the accident. Objection by appellee to the question was sustained. We find no error in the exclusion of this testimony. The Supreme Court of Ohio in Boles v. Montgomery Ward & Co., 153 Ohio St. 381, 92 N.E.2d 912, stated:

"The admissibility of evidence as to similar occurrences to show notice or knowlege of danger is generally confined to situations where there are conditions of permanency such as defects in substantial structures like buildings, machines, sidewalks and streets. Such evidence is not competent or admissible where it relates to a temporary condition which might or might not exist from one day to the next and where there is no showing that conditions surrounding the prior occurrences persisted and surrounded the occurrence which resulted in plaintiff's injury. See 29 Ohio Jurisprudence, 680, Section 182; 32 C.J.S., Evidence, § 585, p. 439, and 20 American Jurisprudence, 284, Sections 305 and 306."

This quotation disposes of the argument. The transitory or temporary nature of the conditions which were in existence at the time of Newman's injury are so obvious that they need not be set forth. Witherspoon v. Haft, 157 Ohio St. 474, 106 N.E.2d 296, cited by appellant, has absolutely no application to the instant case.

### Exclusion Of Testimony Of Superintendent Of Ships, Thomsen

Appellant argues that error was committed when the trial court sustained an objection to the following question of Superintendent of Ships Thomsen on direct examination:

"Q. Whose responsibility is it to keep that area free of ice and snow?"

No proffer was made as to what the answer would have been. Rule 43(c) of the Federal Rules of Civil Procedure. The question itself is vague and calls for a conclusion by the witness which contains both fact and law. "Responsibility" is also a vague word. We note that immediately after the question was excluded, appellant's counsel asked Thomsen the following question:

"Q. Can you describe to us the general duties of the second mate on watch when the ship is docked in the absence of the Captain and when the first mate is off watch?"

The witness answered this question without objection. We find no error in the action of the trial judge in excluding the question. In any event prejudice cannot be shown because of subsequent questions allowed to be asked of the same witness.

### Was Error Committed When Appellee's Counsel Was Allowed To Ask Appellant's Medical Witness On Cross-Examination Whether In His Opinion Good Advice Had Been Given To Appellee By A Company Doctor To Return To Work After He Returned From A Marine Hospital?

Appellant produced as its witness, Dr. Klein, who had examined appellee at the request of appellant and who had studied the marine hospital records

relating to appellee's injury. The following question was asked by appellee's counsel:

"Q. Dr. Klein, sometimes we lawyers do talk louder than we should and we are unaware of it. Dr. Klein, do you have an opinion from what you know about this injured man and your examination of him from the questions which Mr. Bleecker gave you as to whether after they took out the semilunar cartilage in the Marine Hospital on August 30, 1955, some eight months after his injury, and when they told him he could go back to work, and he was in the hospital then until October 22nd and they told him then that they thought he could go back to work, and his work involved using his legs climbing perpendicular ladders along bulkheads 25 feet or higher, climbing up and walking down steep stairs, doing the work that a mariner on steam vessels, the routine work they do, *do you think that the Marine Hospital gave him good advice at that time about going back to work*, or do you think it was premature and that he may have suffered further injury by trying to work? (Emphasis supplied.) A. Considering what they found on the operating report, I would say they did not give him good advice."

*Mr. Bleecker, appellant's counsel,* asked, "What was the answer?" and Dr. Klein replied:

"A. Considering what they found on the operating report that they made, namely a cruciate ligament injury, osteoporosis dissecans of the patella, with this in mind I think they probably should not have allowed him to go back to work with these defects, and they further did not say in that operative report what they did for those two conditions."

Dr. Klein was then asked:

"Q. And what was omitted was rather crucial information?

"A. Yes, sir, it certainly was."

*No objections were made to these question or answers.*

Appellee's counsel then asked:

"Q. And when the Company doctor, the C & O Railroad doctor, Dr. Goulet, examined this man after he came back from Chicago, and said 'Go back to work,' do you think he gave him good advice?"

Mr. Bleecker then objected, but the trial judge allowed Dr. Klein to give his *opinion*, which was "If this doctor knew what they had found in the operative report, I think he didn't use good judgment."

It had been brought out on direct examination of Dr. Klein that appellee Newman had suffered in 1940 a fracture of the femur about three inches above the left knee joint. It was apparent that appellant was urging at the trial that the earlier fracture in 1940 was the real cause of appellee Newman's disability. We are of the opinion that prejudicial error was not committed when the question was asked of Dr. Klein. Assuming, arguendo, that the question was objectionable, we fail to see wherein prejudice resulted since Dr. Klein had earlier been asked a similar question, which he was allowed to answer without objection, as to advice given to appellee by marine doctors in Chicago. Dr. Klein was an expert witness. He was asked his opinion on a subject with which he was intimately acquainted. His answer to the question in itself was merely a medical opinion as to the soundness of another doctor's action based on certain proven medical facts and records.

### Remarks Of Counsel

We find no prejudicial error in failure of the Court to interfere on its own motion when counsel for appellee interrupted cross-examination of appellee and testified in the presence of the jury. The statement made by appellee's counsel was made in support of an objection. Significantly, counsel for appellant answered the objection and the objection was withdrawn by appellee's counsel

without any ruling by the trial court. Further, the question originally asked was not answered by appellee nor was the question re-asked. Cf. Dunlop v. United States, 164 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799.

### Was The Verdict Excessive?

 Appellee was 29 years of age when the accident occurred and had a life expectancy of 35 years. He was a licensed second mate, and at the time of the accident was working as a third mate. His income in 1953 was $7,564.65. Dr. Duncan, an orthopedic specialist, testified that appellee had a torn semi-lunar cartilage, a ruptured ligament, osteoporosis in the knee joint and 35 to 50% permanent partial disability. Dr. Duncan testified that it was "conjectural as to whether or not this man (appellee) will go back to a point in which he will be able to carry out the various types of things, physical activities, which you have described, without a certain element of hazard to him." Dr. Duncan also stated that he did not believe the earlier fracture above the knee joint in 1940 played any part in the present condition of appellee.

Appellee was awarded $60,000 by the jury. This Court recently stated in Imperial Oil, Ltd. v. Drlik, 6 Cir., 1956, 234 F.2d 4, 11, that:

"An award will not be set aside by a reviewing court unless it is so large as to strike the court that it is manifestly unjust, such as being the result of passion or prejudice or a disregard of the evidence or the rules of law."

See also: Neese v. Southern Railway Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60; Detroit, T. & I. R. Co. v. Hahn, 6 Cir., 47 F.2d 59, 60; Great Lakes Greyhound Bus Lines v. Hightower, 6 Cir., 163 F.2d 1016. We do not find error on this point.

### Exclusion Of Medical Testimony

 We have examined the record and noted the question put to Dr. Klein, by appellant, as to an old leg fracture suffered by Newman in 1940. The doctor answered before an objection was voiced. However, the question was asked and answered, and the answer stood unstricken, though an objection was sustained. We think appellant was not harmed. In fact, appellant was aided by the question being answered. The question itself was improper because of lack of information possessed by Dr. Klein as to the old fracture, as well as in the way in which it was asked.

Judgment affirmed.