**GAINES W. HARRISON & SONS, INC.,**
**Plaintiff,**

v.

**J. I. CASE COMPANY, Inc., Defendant.**
**CA. No. AC–141.**

United States District Court
E. D. South Carolina,
Columbia Division.

Jan. 19, 1960.

Townsend & Townsend, Robinson, Mc-Fadden & Dreher, Columbia, S. C., for plaintiff.

McKay, McKay, Black & Walker, Columbia, S. C., John G. Vergeront, Milwaukee, Wis., for defendant.

TIMMERMAN, Chief Judge.

This cause was tried before me and a jury at Columbia at the June, 1959 term. It resulted in jury verdicts in favor of the plaintiff for $40,000.00 on its Second Cause of Action and for $5,000.00 on its Fourth Cause of Action, the First Cause of Action having been withdrawn by the plaintiff at the opening of the trial and I having directed a verdict in favor of the plaintiff on its Third Cause of Action during the course of the trial and subsequently, on June 25, 1959, issuing a formal order to that effect, stating my reasons. Within proper time after the trial, the defendant served and filed written motions for judgments in its favor notwithstanding the verdicts on the several causes of action or, in the alternative, for a new trial. Because of illness, it was impossible for me to hear these motions until December 4, 1959.

The written grounds of the defendant's motions are quite numerous, but in his oral presentation, counsel for the defendant presented his contentions under nine main points, with sub-points under some of them, and stated that these points cut across and embrace all of the grounds for judgments n.o.v. and for a new trial in the written motions and that a disposition by the Court of the points made in oral argument would cover all of the points upon which he was relying. It appears to me that counsel is correct in this, so I will discuss *seriatim* the points raised on the oral argument without reference to the numbered grounds of the defendant's written motions.

The plaintiff's Second Cause of Action was based upon the theory that the dealings of the parties in adapting equipment which each produced, a tractor by Case and a loader attachment by Harrison, to make a composite piece of machinery (the smaller combination being

known to the trade as the Harrison Loader and the larger, mounted on a heavier Case tractor, as a Harrison Loader Crane) and the agreement to promote jointly the sale of the combination equipment gave rise to an implied contract on Case's part to give Harrison reasonable notice before it ceased supplying Harrison with Case tractors adaptable for use in the combination machines. I held that the plaintiff made out a jury issue on this cause of action and left it to the jury to decide whether all the circumstances and the dealings between the parties gave rise to an implied contract on Case's part that it would give reasonable notice to Harrison before it terminated the arrangement and, if such a contract was found, what would be a reasonable notice. Under my instructions to the jury, it was possible for them to find that a reasonable notice would be one sufficiently long before termination to allow Harrison to adapt its equipment for installation on a different make of tractor.

■■■ The defendant's first point, raised at all appropriate times during the trial, was that there can be no implied contract dealing with the subject matter of an existing express contract between the same parties. I certainly accept that as sound law, but I do not believe that it has application to the present situation in that the only express contract existing between Harrison and Case at the time the implied contract was made, if it was made, was one establishing Harrison as a regular dealer in Case tractors and parts, and the alleged implied contract dealt with an entirely different subject matter, i. e., the development of a combination piece of equipment and its sales promotion by both parties as a unit. It was, and remains, my opinion that the arrangement whereby Case modified its tractors to meet Harrison's requirements and Harrison modified its loader and loader-crane components to meet Case's requirements and entered into a joint promotion of the sales of the combination units was separate and independent from Harrison's status as a regular Case

dealer and could have been terminated by the parties, either before or after the termination of the dealership.

There was uncontradicted testimony that the adaptation of the components of the combination equipment for use with each other was the result of joint activities of Harrison and Case representatives and that there was a definite agreement between the parties that whenever one of them ran an advertisement of the combination in the trade journals the other would run, at its own expense, a comparable advertisement of the combination. There was also testimony that Case representatives worked with Harrison representatives in demonstrating the combination units to the trade and told prospects that Case stood behind the combinations. None of these matters was referred to in any of the dealership contracts which Harrison had with Case through the years, which is to me strong evidence that the parties did not consider that any of their dealings in respect to the development and sale of the combination units was covered by the dealership contracts.

■■■ The defendant argues that since the last written dealership contract between the parties (Exhibit 1), executed on November 30, 1955, referred to Harrison's right to sell the combination machines outside of its regular dealership territory, it must be held that the written contract covered the subject matter of the alleged implied contract. I cannot follow this argument. In the first place, the arrangement between the parties as to the development and sale of the combination machines was in existence long before the 1955 dealership contract was executed. Furthermore, the obvious purpose of the reference in the dealership contract to the sale of the combinations was merely to make it clear, for the protection of Case, Harrison and Case dealers in other territories, that although Harrison's franchise rights in dealing generally in Case products extended only to the State of South Carolina and a few counties in North Carolina, those limitations did not apply

to the combination units at all. Actually, in my opinion, the reference in the 1955 dealership contract to the sale of the combination units can be considered as a recognition by both parties of the pre-existing arrangement on the combinations.

The defendant's second, third and fourth points are also concerned with the Second Cause of Action. Its second point is that no joint venture was established; its third that no joint enterprise was established and its fourth that no implied contract was established. Plaintiff has never sought to prove a joint venture or a joint enterprise in the technical sense. Although its pleadings may use those terms, its cause of action is really based upon the theory that the joint activities of the parties, their joint contributions toward the success of the combination machine and their joint reliance upon each other gave rise to an implied contract that their relationship would continue until its purposes had been accomplished or, at least, for a reasonable time after notice of termination.

■■ In my opinion, the testimony established an express contractual relationship between the parties in the development and promotion of the combination equipment. It is, as I have said, uncontradicted that the parties worked together in adapting their respective portions of the combination for use with each other in the combined unit; that they expressly agreed that each would pay for advertisements of the combination in trade journals and that they worked together in demonstrating and promoting the sale of the combination machine with the trade. Even without the theory of implied contract, this testimony, if believed by the jury, would establish an express contractual relationship which could not, as a matter of law, be terminated without one party giving the other reasonable notice. Smith v. Spratt Machinery Co., 46 S.C. 511, 24 S.E. 376; Butler v. O'Hear, 1 DeS.Eq. 382; Childs v. City of Columbia, 87 S.C. 566, 70 S.E. 296, 34 L.R.A.,N.S.,

542 and 12 Am.Jur. 860, Contracts, Sec. 305.

■ The defendant's next point is that I erred in not permitting it to amend its answer during the trial to set up the Statute of Frauds. On cross-examination, the plaintiff's president stated that he did not expect the alleged implied contract to last "just one year," that he did not expect it to be terminated within a year, and that it could not be completed within one year. T. 134–5. In its motion for a new trial the defendant made the contention that the implied contract was barred by the Statute of Frauds and I held that the point could not be raised because it had not been pleaded. Defendant's counsel thereupon moved to be allowed to amend the answer to set up the Statute and, in the exercise of my discretion, I refused the motion.

Rule 8(c) of the Rules of Civil Procedure, 28 U.S.C.A., specifically requires a party to set forth affirmatively the defense of the Statute of Frauds if he intends to rely upon it. Although amendments are freely allowed in Federal practice, allowing the technical defense of the Statute of Frauds to be raised during the argument of a motion for directed verdict at the conclusion of the plaintiff's testimony would obviously have taken the plaintiff by surprise and placed it at a great disadvantage. Its counsel would not have had the question briefed because they had not been put on notice that it would be raised and for me to have allowed the amendment and immediately ruled on what would probably have been an extremely complicated legal issue would not have been fair to the parties, their counsel or the Court.

Defendant's counsel claims that the reason he did not raise the defense was that the complaint did not allege that the implied contract relied upon could not have been performed within one year. He says that the complaint set up a contract indefinite in duration and that there is legal authority for the proposition that such a contract may be terminated by either party at any time. I do not see how it is possible to read the

plaintiff's Second Cause of Action as alleging a contract that could be terminated without notice by either party at any time. The complaint nowhere alleges that the implied contract could have been performed within a year and the contrary is, at least impliedly, asserted.

The defendant's representatives knew as much about the transaction out of which the alleged implied contract arose as did the plaintiff's representatives, and if the defendant desired to know more about the plaintiff's view of the transaction, it could have explored the whole field through discovery processes. The record shows that Case did take the depositions of five representatives of the plaintiff prior to trial, including that of its President. The defendant, therefore, knew, or could find out, as much about the factual basis of the plaintiff's claim under the Second Cause of Action as the plaintiff knew; it was advised by the complaint that the plaintiff was relying upon those facts to give rise to an enforceable implied contract on its part; and if it wished to set up the defense that the alleged contract was barred by the Statute of Frauds, it had to do so in its answer.

█ The defendant's contention that Rule 15(b) of the Rules of Civil Procedure requires the answer to be amended to permit the Statute of Frauds defense is patently unsound. The issue as to the Statute of Frauds was not "tried by express or implied consent" of the plaintiff. As soon as the Statute of Frauds was raised, the plaintiff took the position that it was not before the Court because it had not been pleaded.

█ The defendant's next point is that under neither the Second Cause of Action nor the Fourth Cause of Action did the plaintiff offer competent evidence sufficient to go to the jury as to its damages and that the jury verdicts on those two causes of action were excessive and not supported by the evidence. It is quite true that the plaintiff's damages were not proved with exactness, but we have here, as in so many other breach of contract cases, a situation where damages are inherently impossible to prove with exactitude. Our courts have long since passed the point of denying recovery to a wronged party simply because he cannot prove the amount of his loss in an exact amount. Businessmen do not keep their records with a view to proving damages in a lawsuit, and a contract breaker is not in a position to complain if the jury is of necessity permitted to act upon "probable and inferential as well as direct and positive proof." Hampton v. Supreme Lodge, 161 S.C. 540, 159 S.E. 923, 925. See also Charles v. Texas Company, 199 S.C. 156, 18 S.E. 2d 719; Lester v. Fox Film Corporation, 114 S.C. 533, 104 S.E. 178 and 15 Am. Jur. 412, Damages, Section 21.

█ The clearest proof which the plaintiff presented of the loss which it suffered as a result of the defendant's refusal to continue supplying it Case tractors upon which to install its loaders and loader-cranes lay in plaintiff's Exhibit 10 and the oral testimony pertaining to it. This exhibit shows the number of the combination loaders and loader-cranes sold by the plaintiff for the years 1952 through 1958, the price paid Case for the tractors which went to make up the combinations and the price paid to Harrison Manufacturing Company, plaintiff's subsidiary, for the attachments, and the gross profit which the plaintiff realized on the combination sales for each year. The defendant refused to furnish the plaintiff with Case tractors for use in the combination in January of 1957. The plaintiff had a few Case tractors on hand and they were adapted into combinations and sold that year and the next, but the sales of the combination machinery in 1955 and 1956 afforded the jury the only yardstick for determining the sales which would have been probable in normal subsequent years. The record discloses no reason for the sales of the combinations to have abated after 1956 other than the defendant's refusal to supply its component any longer, and there was testimony for the plaintiff that, with the strengthening of the plywood industry in the southeast,

the market was just opening up when the defendant refused to supply any more tractors.

It will be noted that in 1955 the plaintiff sold 8 loaders and 5 loader-cranes and in 1956 it sold 12 loaders and only one loader-crane. (That no more loader-cranes were sold in 1956 is explained by the plaintiff's witnesses on the ground that in 1956 Case had brought out a diesel tractor to be used in the combinations and some redesign of the Harrison equipment was necessary to adapt it for installation upon the new tractor.) The plaintiff's testimony, uncontradicted on the record, was that it took it a year to redesign and fabricate its loader attachment for installation upon an Oliver tractor, the make which the plaintiff commenced working with when it was denied Case tractors, and that it was going to take it at least three years to be in a position to install its loader-crane attachment on some make of tractor other than Case. The necessary re-designing on the loader-crane had not been completed at the time of the trial.

The jury was therefore justified in considering that because of Case's wrongful termination of the arrangement, Harrison lost the profit which it would have made on one year's normal sale of loaders and three year's normal sale of loader-cranes. Taking the 12 loaders sold in 1956 as a normal year's sales of that equipment, the plaintiff lost a gross profit, according to Exhibit 10, of $26,582.28. Taking the sale of 5 loader-cranes in 1955 as a reasonable expectation of sales in future years, 1955 being the last year in which the plaintiff enjoyed an unlimited market before the conversion to the diesel tractor and before Case ceased supplying any tractors, the plaintiff in the ensuing three years could have reasonably expected a gross profit of over $46,000.00 on loader-crane combinations. If the jury so accepted these figures, they could have found that the defendant's failure to give the plaintiff sufficient notice of the termination of the supply of its tractors to permit the plaintiff to redesign its appliances for use on different makes of tractors lost the plaintiff some $72,000.00 of profits.

To be sure, the profits shown on plaintiff's Exhibit 10 are gross profits, but it is difficult to see how the plaintiff could, under normal bookkeeping procedures, have translated those lost gross profits into lost net profits. The sale of these combinations was only a part of the plaintiff's general business and an allocation of general overhead costs to these particular sales could have been, at best, only an estimate. I left it to the jury, as persons of general business experience, to deduct from the anticipated gross profits on the combinations a proper amount of overhead. If the jury accepted the calculations of lost gross profits as I have just outlined them, their verdict of $40,000.00 would reflect a deduction of over 40% for overhead. Under such a conservative approach, I cannot say that the verdict was without foundation in the record or was excessive.

Exactly the same type of damage proof was found adequate by the Supreme Court of South Carolina in Charles v. Texas Company, supra, 199 S.C. 156, 18 S.E.2d 719, to support a verdict for the wrongful breach of a gasoline distributorship contract. The plaintiff in that case showed only that had the distributorship not been terminated he could have probably sold so many gallons of gasoline per month and that he would have had a gross profit of a certain number of cents per gallon. The Supreme Court held that these figures provided an adequate basis for a jury verdict based upon lost profits. To my mind, the plaintiff's proof of damages in the present case is clearer than that approved in the Charles case.

The plaintiff's Fourth Cause of Action, upon which a verdict of $5,000.00 was returned, was based upon the theory that its general dealership for Case was terminated contrary to standards of equity and good conscience so as to permit recovery under the theory of the South Carolina case of Philadelphia Stor-

**250**

age Battery Co. v. Mutual Tire Stores, 161 S.C. 487, 159 S.E. 825.

 I was careful to instruct the jury that they could not duplicate damages under the Second and the Fourth Causes of Action and I feel that their verdict of only $5,000.00 on the Fourth Cause of Action indicated a compliance with those instructions. What the plaintiff may have lost as a result of the defendant's alleged wrongful termination of its dealership in Case tractors and parts would again be impossible of specific proof. Of necessity, if the Case franchise had a value, Harrison lost something, and I believe that the $5,000.00 verdict was a reasonable appraisal by the jury of the plaintiff's probable loss. Figures, although inexact, rather than speculation, support the verdict.

Plaintiff's Exhibit 14, introduced by the plaintiff but prepared by an accountant for the defendant from the plaintiff's records, shows the net profit from the plaintiff's whole business for the years 1952 through 1958. The plaintiff's president testified that approximately 90% of its entire business was in the sale of Case tractors and parts and the servicing of Case equipment. The jury was justified in roughly calculating therefore, that 90% of the net profits came from the sale and servicing of Case products. Although the yearly net profits for the seven years to which plaintiff's Exhibit 14 refers are relatively low, considering the amount of the sales, 90% of such profits for a reasonable time after the termination, even excluding profit from the combination sales covered in the Second Cause of Action, would have been much in excess of $5,000.00.

The $5,000.00 verdict is also supported under an entirely different item of loss. What is involved in the Third Cause of Action is the defendant's obligation under the contract to repurchase, after termination, the Case parts in the Dealer's hands. The formula upon which the repurchase price is based involves, among other things, a deduction of 25% from the Dealer's price of the returned parts and the Dealer, in addition, is required to pay freight from his plant to Case's and to pay for the packing of the parts. The calculation introduced by the plaintiff as its Exhibit 4 to support the amount which it claims due on its return of Case parts following the termination shows that it had on hand for return parts with a dealer's cost of $42,533.78. This figure represents what plaintiff is actually out of pocket for the parts in its hands but I permitted it to recover under the Third Cause of Action only $31,900.34 upon its return of the parts. It therefore has a loss, because of the termination and the necessity of returning the Case parts, of over $10,000.00, and in addition must pay freight on the parts from Columbia to Charlotte and pay for packing the parts. If the entire termination was improper, as the jury found it to be in returning a verdict on the Fourth Cause of Action, the verdict of $5,000.00 is more than twice accounted for in this loss which the plaintiff must absorb in returning the parts.

Reverting to the defendant's argument as to the alleged excessiveness of the recovery under the Second Cause of Action, the fact that the plaintiff's net profits for 1952 to 1958 are in the record in Exhibit 4, just referred to, leads the defendant to the contention that the plaintiff could not have lost $40,000.00 in profits on the sale of the combination equipment for a few years if its net profits on its whole business were not higher than Exhibit 4 shows them to have been. The relative smallness of the annual net profits is very likely explained by the fact that the plaintiff is a family corporation with the normal tendency of such enterprises to pay out of its gross profits substantial salaries to those family members who conduct the business. Whether or not that is the explanation, the fact that the plaintiff made little or no net profit on this business as a whole cannot bar it from recovery of the profit which it lost from being deprived wrongfully of a portion of its business. It may have been that the profit on the combination sales was needed to offset losses in other departments of the business. If the de-

fendant's theory on this point were sound, it could not be held responsible for any business wrong which it did to the plaintiff unless the plaintiff had been operating at a net profit before the wrong was committed.. The contention overlooks the possibility that the small annual profit which the company was showing during the years prior to the termination could well have been a sizeable net loss had the plaintiff not enjoyed the profits on the sale of the combination machinery.

The defendant next argues that I was in error in directing a verdict for the plaintiff on the Third Cause of Action, which sought an enforcement of the defendant's obligation under the written contract to pay for parts returned to it by the plaintiff upon the termination of the dealership. The only issue which the trial disclosed between the parties as to the return of the parts was whether the parts offered for return by the plaintiff met the standards of returnability set out in the contract. My order of June 25, 1959, sufficiently sets forth my reasons for holding that the parts offered for return did satisfy the contract requirements and I shall not go further into that phase of the question. The defendant maintains, however, that the judgment which I granted by my order of June 25, 1959, depends upon so many conditions for its finality as to make it indefinite and unappealable.

It is regrettable that a simple money judgment could not have been entered on the Third Cause of Action, but I could see no other practical solution to the problem other than to give the type of judgment which I did and counsel for neither party could suggest any better solution. The complications arise mainly from the fact that the parts inventory taken by the plaintiff (which of itself takes five or six weeks to accomplish) was completed several months before trial and parts had been sold by Harrison in the regular course of its business throughout that period, this being in the interest of both parties. Thus, the inventory introduced by the plaintiff at the trial did not then represent the parts actually available for repurchase.

Further, Case, quite properly, has the right under the contract to reject parts tendered to it which are not in an unused and saleable condition. I saw no way to protect the rights of both parties except to issue an order which gave the plaintiff a money judgment in an amount determined by the contract repurchase formula, presupposing a return by the plaintiff of all the parts shown on its inventory in an unused and saleable condition, and to give the defendant credit on the money judgment for the parts which the defendant would not be able to return in a proper condition.

In my order of June 25, 1959, I attached one further condition to the entry of the judgment on the Third Cause of Action and I did so with a view to protecting the defendant's rights as completely as possible. As the order states, it is my construction of the contract that Harrison is entitled to return all parts which are unused and saleable as new, which are for use on Case equipment currently being used in this area, which are currently offered by Case to its dealers and for which there is a reasonable current demand by the owners of Case equipment. Inasmuch as Case was interpreting the contract in a more limited manner, I provided that it should have the opportunity of filing with the Clerk of the Court, within thirty days of my order, a list of the parts shown on the plaintiff's inventory which it considered as not qualifying for return under my interpretation of the contract and that if such a list were filed a hearing would be had on that phase of the matter. No such list has been filed, so it can be assumed that the defendant is conceding that all of the parts shown on the plaintiff's inventory (Plaintiff's Exhibit 3) do meet the standards of returnability under my construction. Therefore, as my order stands, the plaintiff would have had the right at any time after July 25, 1959, to return to Case the parts shown on its inventory and, after giving Case credit for the parts sold since the inven-

tory was taken and for parts which are not delivered in an unused and saleable condition, to enter the money judgment allowed by my order. This has not been done and counsel for the plaintiff stated at the hearing that they had felt that it was unwise to take these steps in view of the possibility of an appeal in the cause. If the parts were returned under the terms of my order and the Court of Appeals should later find error in my disposition of the Third Cause of Action, it would be most difficult, if not impossible, to put the parties back in their original positions. I agree with this practical view of the situation and I can see no objection to holding up the procedures contemplated by my order until after the Court of Appeals has acted upon the matter if an appeal is taken. Whatever parts can be sold by the plaintiff in the meantime will reduce the amount which the defendant may eventually have to pay and will also save the plaintiff from losing the 25% deduction from the dealer's prices.

 Defendant's counsel expressed the fear that the Court of Appeals might not consider my order of June 25, 1959 appealable. In my judgment, so far as appealability is concerned, my order may be considered a final one. It was self-executing when it left my hands. It is true that it provides that this Court shall retain jurisdiction of all issues dealing with its proper enforcement, but many equity orders carry such a provision, either expressly or impliedly, and they are nonetheless final for that reason.

 In respect to my direction of a verdict on the Third Cause of Action, the defendant makes the further argument that its contract to repurchase the parts is governed by the same measure of damages rule as a normal contract to buy personal property, so that upon a breach by the defendant the plaintiff can recover only the difference between the contract price (in this case the amount that would be due under the repurchase formula) and the market price of the goods. The defendant insists that since the plaintiff did not prove the market value of the parts which it has on hand, it is entitled to no relief on the Third Cause of Action. As a practical matter, one manufacturer's parts in the quantities held by Harrison would have no market if sold as a unit except with the manufacturer itself or some dealer of the manufacturer who needed an entire stock of parts. There is now no Case dealer in the Columbia area and I am very doubtful that Harrison would have received any reasonable offer for the purchase of all of these parts if it had offered them for sale in bulk. It could very easily have put up testimony that on a forced sale of the entire lot of parts only a small percentage of their real value could be realized. If this had been done and the market value of a few thousand dollars had thus been established, the defendant would have had to pay, under the test which it now advocates, the difference between that price and the price which it was obligated to pay under the contract and the plaintiff would have been entitled to retain all of the parts. Such a result would have been grossly unfair to the defendant.

A complete answer to the defendant's position on this lies in the fact that Case had never refused to repurchase the parts as it was obligated to do under the contract. In fact, Case's own witnesses stated at the trial that they have been willing to accept the return of the parts at all times since the termination and were still desirous of performing their obligation in this respect. That being true, the only remaining issue involved a determination of which parts were returnable under the contract and the price which Case would have to pay upon their return. Those were the issues which the trial determined and it is entirely academic to consider what would be the measure of damages if Case had arbitrarily refused to take back the parts.

 The defendant's last two points are concerned with the Fourth Cause of Action. In the interest of clarity, I will discuss the last point first, i. e.,

the claim that the plaintiff is not entitled to any recovery because all that the defendant did was decline to renew a dealership contract which had already expired by its terms. The plaintiff's Fourth Cause of Action is pitched altogether upon the rule of law announced by the Supreme Court of South Carolina in Philadelphia Storage Battery Co. v. Mutual Tire Stores, 161 S.C. 487, 159 S.E. 825, 826. That rule is that, regardless of broad termination rights in a contract between a manufacturer and a distributor or dealer, an actionable wrong is committed by the one who terminates the relationship "if the manner of its termination be against equity and good conscience." That principle, admittedly different from the rule prevailing in most American jurisdictions, has never been overruled or criticized by the South Carolina court and I am bound to apply it where applicable. In my opinion, the plaintiff's testimony as to the circumstances surrounding the termination of the dealership in the present case was sufficient to take it to the jury on the question of whether the termination was carried through in equity and good conscience.

The plaintiff had been a Case dealer for many years and, prior to its incorporation, its President, Mr. Gaines W. Harrison, held a Case dealership in his own proprietorship. The dealership was evidenced by a series of written contracts, each extending for a definite period, but frequently several months elapsed following the technical termination of a contract before a new one would be executed and in the meantime the parties continued to treat with each other as manufacturer and dealer. The last written contract which the plaintiff had with Case was executed on November 30, 1955, and expired according to its terms on October 31, 1956, but, once again, the passing of the termination date had no effect upon the actual dealings between the parties. Harrison continued to act as a Case dealer, ordered goods as a dealer and had those orders filled by Case in accordance with the terms of the technically expired contract. In January of 1957, Harrison received a letter from Case saying that the contract would not be "renewed" and suggesting the negotiation of a new contract. When Mr. Harrison asked for an explanation of what was happening, he was told by Case officials that he should not worry and that a Case representative would call upon him to work out a continuation of the dealership. Some weeks later Case representatives did call upon Mr. Harrison for that purpose and offered terms for a new contract. The testimony differs as to the terms which Case offered but accepting the testimony of the plaintiff, as I was required to do in ruling on the motion for a directed verdict, Case stated that plaintiff could not continue as a dealer unless it agreed (1) to buy $86,000.00 worth of crawler-type tractors, a type of tractor which Harrison was not then handling for Case; (2) not to handle any competitive lines of tractors; (3) to accept a lower discount rate and less favorable credit terms than it was then enjoying; and (4) to lose what rights it had under the old contract to return goods on a termination. Mr. Harrison declined to accept those terms and his status as a Case dealer immediately terminated. There was also testimony that during these final negotiations, the question arose as to whether Case would continue to supply tractors to Harrison to use in the combination machines and the Case representatives stated that Case intended to make their own loader attachments. Witnesses for the defendant admitted that Case is now manufacturing its own combination machines.

With the background of Harrison's long and faithful representation of Case, the refusal to renew the dealership unless Harrison would invest a large amount of money in tractors which he did not want and would agree not to deal in any competitive line of tractors could, and evidently was, found by the jury to be so arbitrary as to lack "equity and good conscience" within the principle of the Philadelphia Storage Battery case.

■ The defendant argues that the Philadelphia Storage Battery case can be distinguished because there an existing contract was terminated and here there was merely a failure to renew a contract. I can see no true difference in the two situations. In the Philadelphia Storage Battery case the written document clearly gave the manufacturer the right to terminate at any time. In the case at bar the manufacturer had the comparable right to terminate the relationship at any time after the expiration date of the written agreement. The passing of the expiration date in the writing did not affect the dealership any more in October 1956 than it had upon all of the other occasions when the contract had technically expired but the parties continued to operate under it. Harrison was still making sizeable orders and Case was filling them under the contract just before the letter came in January 1957 saying that the contract would not be renewed. The dealership was therefore terminated in January 1957 rather than in October 1956 and the termination, as I see it, had exactly the same legal effect as did the termination in the Philadelphia Storage Battery Co. case. In both instances the manufacturer's right to cease doing business with the dealer undoubtedly existed under the cold language of the written documents; but the principle of the Philadelphia Storage Battery Co. case that such rights may not be exercised in violation of equity and good conscience apply just as well to one situation as to the other. What is important in both cases is that a manufacturer-dealer *relationship* has been terminated to the detriment of the dealer and if the termination was so arbitrary and coercive as to be wanting in equity and good conscience, the dealer is entitled to recover the damages that he suffers thereby.

■ The last point to be discussed is the defendant's contention that I erred in charging the jury that in determining whether the defendant's termination of the dealership was carried out in equity and good conscience it could consider whether or not, under the evidence, the defendant conditioned its giving the plaintiff a renewal of its dealership upon the plaintiff's agreeing to take on no tractor line competitive with the defendant, and if such a condition were prescribed, the jury could find in it an attempt to violate the Clayton Act (15 U.S.C.A. § 14). The possible violation of the Clayton Act bore only, of course, on the primary issue in the Fourth Cause of Action as to whether the defendant's termination was accomplished in equity and good conscience. If it were accomplished because of the plaintiff's refusal to agree to an illegal requirement, the requirement of equity and good conscience in the termination would certainly be lacking. The defendant argues, however, that it was error for me to charge on the Clayton Act at all inasmuch as the Courts have held that there is no violation of the Clayton Act unless an agreement is reached prohibiting dealing in a competitive line and here Harrison refused to so agree.

The plaintiff here is not suing under the Clayton Act for treble damages or otherwise claiming that a violation of the Act was actually consummated. What it claims is that one element of its proof that the termination was accomplished without equity and good conscience is supplied by the fact that the only contract which the defendant would accept from the plaintiff in continuing his dealership was one which would have been violative of the Clayton Act had it been signed. In other words, the plaintiff's position is that the defendant's attempt to arrive at a contract with the plaintiff violative of the Clayton Act shows its whole negotiations and resulting termination of the dealership to be opposed to equity and good conscience.

There can be no doubt but that Section 3 of the Clayton Act makes illegal a contract made "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal

in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller," where the effect would be to substantially lessen competition or tend to create a monopoly. The Courts do hold, as defendant points out, that there is no direct violation of the Act unless the prohibited contract was made. See United States v. J. I. Case Co., D.C. Minn., 101 F.Supp. 856, and McElhenney Co. v. Western Auto Supply Co., 4 Cir., 269 F.2d 332. Those very cases squarely recognize, however, that if such a contract is made there is a violation of the Act if its effect on interstate commerce is sufficiently substantial. In the McElhenney case, Judge Sobeloff made it clear that the exclusive aspects of the dealership need not appear in any written instrument to be illegal but that if an exclusive condition is understood under all of the circumstances of the dealings of the parties, the Act is violated.

There was never any issue in this case as to whether the Clayton Act was actually violated. Under the McElhenney case and other similar decisions, it was not. However, as I have said, if the defendant insisted upon conditions which would have been illegal if agreed to as a prerequisite to continuing the plaintiff's dealership and terminated the dealership because of the plaintiff's refusal to accept those illegal conditions, the jury was perfectly justified in considering that the resulting termination was, for that reason alone if not for others, lacking in equity and good conscience within the rule of the Philadelphia Storage Battery Co. case. I find no error in having submitted the question to the jury on this theory.

Agreeing with counsel for the defendant that my disposition of the points made by him in oral argument covers all of the grounds of his various motions, I hereby, for the reasons stated, overrule the several motions for judgment notwithstanding the verdicts and the alternative motion for a new trial.