AMERICAN HOT ROD ASSOCIA-
TION, INC., Appellee,

v.

Robert L. CARRIER, Appellant.

AMERICAN HOT ROD ASSOCIA-
TION, INC., Appellant,

v.

W. R. LAND, Jr., et al., Appellees.

Nos. 73–1964, 73–1965.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 9, 1974.

Decided July 17, 1974.

Lloyd S. Hellman, Kansas City, Mo. (Keith E. Witten, Achtenberg, Sandler & Balkin, Kansas City, Mo., Louis A. Bledsoe, Jr., Berry, Bledsoe & Hogewood, Charlotte, N. C., on brief), for appellant in No. 73–1965 and for appellees in No. 73–1964.

Richard M. Hutson, II, Durham, N. C. (Hofler, Mount, White & Long, Durham, N. C., Hugh A. Lee, Webb, Lee, Davis & Gibson, Rockingham, N. C., on brief), for appellees in No. 73–1965.

Seawell, Pollock, Fullenwider, Van-Camp & Robbins, P. A., Southern Pines, N. C. (Gore, Ladd & Gillenwater, Bristol, Tenn., on brief), for appellant in No. 73–1964.

Before HAYNSWORTH, Chief Judge, and WINTER and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This multi-count diversity case arises out of the alleged breach of a contract involving the sanctioning and promotion of major drag races at Rockingham, North Carolina.

The American Hot Rod Association, Inc. (AHRA) brought this suit against W. R. Land, Jr., L. G. DeWitt, Jerry L. Goodwin, Franklin McKay, and J. M. Long, doing business as the Rockingham International Dragway (Land, et al); the Rockingham International Dragway, Inc. (Rockingham); Robert L. Carrier; and the International Hot Rod Association (IHRA). Count I of the complaint

alleged breach by the defendants, Land, et al, and Rockingham, of a written contract of October 5, 1968 giving AHRA certain sanctioning privileges over a period of five years at the Rockingham International Dragway. Count II claimed that Carrier and the IHRA had tortiously interfered with the October 5, 1968 Rockingham contract, and also that Carrier had breached its fiduciary duty as an agent of AHRA. Count III, alleging a conspiracy to breach the contract, was dismissed by AHRA. And Count IV, against Carrier solely, alleged breach of a written non-competition agreement given by Carrier in favor of AHRA.

These issues were tried before a jury which, on May 24, 1973, found by special verdict in favor of the defendants and against AHRA on Counts I and II. AHRA, in No. 73–1965, appeals both Counts. As to Count IV, the jury returned a special verdict in favor of AHRA and against Carrier in the amount of $100,000. Carrier, in No. 73–1964, appeals this judgment. We find no error in No. 73–1965 and affirm. But, in No. 73–1964, we reverse and remand with instructions.

I.

AHRA is a Missouri corporation engaged in the business of sanctioning and co-promoting drag races. The organization serves to provide a pool for the purchase of spectator liability and racers' insurance; to formulate a standard set of rules regarding the construction of cars; to approve times and records set; and to use its name and reputation in sanctioning certain major races. AHRA also solicits participation by well-known drivers and advertises races in return for a portion of the net proceeds.

The defendant, Robert L. Carrier, is a Tennessee resident who has been involved in various aspects of the business of racing since 1960. As part owner of the Bristol International Speedway, he has constructed and operated a round track since 1961, and a drag track since 1965. Carrier has considerable experience in handling promotions, including advertising, of drag racing events.

James M. Tice, the President of AHRA, first met Carrier in 1964. In 1968, AHRA began sanctioning and co-promoting drag racing events at Carrier's Bristol track. At approximately the same time, Tice appointed Carrier an honorary vice-president with AHRA in charge of sanctioning drag racing in the southeastern United States. For these services, Carrier was paid no salary.

In 1968, Carrier met with a group of investors, including Land and others, who wanted to develop a drag racing strip near Rockingham, North Carolina. None of the investors were experienced in the operation or promotion of major drag racing events. Carrier negotiated a contract, however, involving as separate parties AHRA, Carrier, and the investors, which was signed on October 5, 1968. Under this agreement, two drag racing events were to be held annually for a period of five years at Rockingham. AHRA, on the one hand, and Land and the other investors, on the other, were to share equally in the net profits (as defined by the contract) or losses of each race.

Land and the other investors were responsible for the entire financial investment in the construction of the race track, which included the drag strip, spectator stands, and buildings. AHRA's duties were to sponsor, sanction, and promote two major races annually at the new track. Carrier, who signed the contract in an individual capacity as a third party, was given additional responsibilities, as noted in Item 2 of the Agreement.

"The Dragway agrees that Larry Carrier is retained in an advisory capacity to the Dragway, and shall be continually retained by the corporation, Rockingham International Dragway, Incorporated, under the assignment of this contract, in an advisory capacity, both in the construction of Rocking-

ham international Dragway and in the operation of the Rockingham International Dragway . . . ."

Carrier was to receive $5,000, plus expenses, from the gross receipts of each major race in return for serving in this capacity.

To avoid competition in the surrounding area which would endanger their large financial investment, Land and the other investors insisted that the following clause be inserted into the contract:

"'AHRA' agrees that it will neither sanction nor sponsor, nor directly or indirectly support any other major race event upon any race track in the State of North Carolina, nor within a radius of 150 miles."

Paragraph 20 defined a "major race event" as

"[a]ny race for which 'AHRA' brings in a crew and manages the race, and/or for which 'AHRA' directly participates in securing the prize monies."

Several months after the negotiation of the Rockingham contract, AHRA and Auto Racing Franchise Corporation (ARFCO) entered, on December 11, 1969, into a franchise agreement granting ARFCO exclusive sanctioning rights in certain areas of southeastern United States. ARFCO was a corporation formed to permit Carrier and his Bristol partner, Carl Moore, to share in the monies to be earned in representing AHRA throughout that area. Paragraph 6(e) of this agreement provided that ARFCO agreed to:

"Refrain from . . . in any way aiding any other racing organization, race promoters, automobile sanctioning bodies, or other parties now or to be in competition in drag racing with AHRA. . . . ARFCO further agrees to obtain from any of its officers and key employees . . . a non-competition covenant (copy of which is attached hereto) and ARFCO hereby agrees to make said non-competition covenant a prerequisite for employment. . . ."

Pursuant to the AHRA–ARFCO agreement, Carrier executed a covenant not to compete with AHRA, on December 15, 1969, as follows:

"[T]he undersigned does hereby covenant, contract and agree that during the time he is an office holder of, a member of the Board of Directors of, or an employee of ARFCO, and for five (5) years after his total termination with ARFCO, he will not directly or indirectly, as principal, partner, agent, employee, or otherwise compete with AHRA, carry on or be concerned with, or be financially interested in drag race promotions, scheduling, or any other arrangements relating to drag racing, except as the owner of a single track, . . . ."

During late 1968 and throughout much of 1969, Carrier supervised the development of the Rockingham track, both in the planning and construction stages. Three major drag events were held at Rockingham under the October 5, 1968 contract. These occurred in the fall of 1969, and the spring and fall of 1970. But major areas of disagreement soon developed between AHRA and the investors. Well-known race drivers, promised by AHRA, often failed to appear at Rockingham as advertised to the public. The large purses failed to materialize. Disputes arose over the proper accounting of receipts and expenses. And AHRA refused to allow representatives of the investors to operate or jointly staff the pit gates in accordance with provisions in their contract. AHRA also scheduled another major event to conflict with the Rockingham date. During the September 1970 race, when Land and Carrier complained, Tice allegedly explained that if Land and the others were not satisfied they could tear up the contract. Finally, it was learned in November or December of 1970 that, in violation of the terms of the October 5, 1968 agreement, Tice and AHRA, on December 16, 1969, had contracted to sanction and sponsor two major drag races annually in Myrtle Beach, South

Carolina, located within less than 150 miles of Rockingham, North Carolina.

Shortly after the September 1970 race, Carrier informed Land and the other investors of his decision to form a sanctioning body. On November 12, 1970, Carrier incorporated the International Hot Rod Association (IHRA) for the purpose of operating and sanctioning racing events of all kinds. On November 19, 1970, Land advised Tice that Rockingham was repudiating the contract of October 5, 1968. On November 23, 1970, however, Land's attorney wrote Tice, stating that his clients intended to abide by the contract and also that they expected Carrier and AHRA to do the same. Later, on December 10, 1970, Tice, his attorney, and the investors met at the track site in an unsuccessful attempt to reach an accommodation. But, by letter of December 14, 1970, Land and the other investors again repudiated the October 5, 1968 contract.

On December 17, 1970, Rockingham entered into a sanctioning contract with Carrier's IHRA. Under this agreement, IHRA was to share in the net profits or losses of each race by 25%. And Carrier was to receive no fee of $5000 per major drag event as he did under the AHRA contract. Rockingham has continued to operate under IHRA sanctioning since the execution of the contract.

AHRA brought this suit on September 22, 1971. The various claims were tried before a jury which, by special verdict, found that the plaintiff, AHRA, had failed to substantially perform and abide by the stipulations and conditions of the October 5, 1968 contract; that Carrier was an agent of AHRA, but that he had not violated his fiduciary duty in representing AHRA in its business relationships with Rockingham and Land, et al; that the covenant not to compete was valid and enforceable;[1] that Carrier had breached this covenant, and AHRA was entitled to recover $100,000 from Carrier because of this breach. Accordingly, judgment was entered May 24, 1973 for the defendants on Counts I and II, and for the plaintiff in the amount of $100,000 on Count IV. AHRA appeals the judgment in favor of the defendants on Counts I and II; Carrier appeals judgment in favor of the plaintiff on Count IV.[2]

## II.

In Count I, the plaintiff sought to prove that the defendants, Land, et al, and Rockingham, had breached their contract of October 5, 1968 with AHRA. The defendants contended, and the jury found, that AHRA had failed to substantially perform and abide by the stipulations and conditions of the contract. Accordingly, judgment was entered for the defendants. AHRA has appealed, asserting the court committed reversible error by (1) admitting irrelevant and incompetent evidence; (2) failing to instruct the jury that Land, et al, had waived their right to rescind the contract by failing to rescind in a timely manner; and (3) erroneously instructing the jury as to an alleged oral release given by AHRA when there was no evidence of a valid and binding release.

The defendant's view of the case is supported by North Carolina law under which one party to a contract cannot maintain an action for its breach without alleging and proving a performance of his own antecedent obligations arising out of the contract. Edgerton v. Taylor, 184 N.C. 571, 115 S.E. 156, 159,

---

1. The use of the word valid here has no relation to its legal import. The issue put to the jury by the charge was whether or not the covenant was in fact in existence and whether it was supported by consideration.

2. Not involved in this appeal are two counterclaims brought by the defendants. In the first, Carrier alleged that AHRA and its officers, James M. Tice and Ruth E. Tice, had breached an oral agreement to pay him a yearly salary and to transfer to him 20% of the stock of AHRA in return for Carrier's services. In the second, Land, et al, and Rockingham sought damages, alleging that AHRA had breached the October 5, 1968 contract in failing to make an accurate accounting of receipts. The jury found for AHRA on both claims; neither have been appealed.

et seq (1922); McCurry v. Purgason, 170 N.C. 463, 87 S.E. 244, 246, et seq (1915), citing Ducker v. Cochrane, 92 N.C. 597 (1885). The defendants adduced evidence that, in violation of Item 5 of the October 5, 1968 contract, AHRA had entered into a contract to sanction and sponsor two major drag races annually in Myrtle Beach, South Carolina, which is located within 150 miles of Rockingham, North Carolina; that AHRA had failed to make an accurate accounting of all receipts and expenses in accordance with Item 15 of the contract; that the accounting procedures at the pit gate were either non-existent or poorly organized; that AHRA had refused to allow the defendants to operate or jointly staff the pit gate in accordance with Item 13 of the contract; that AHRA had failed to meet its duties under Item 3 of the sponsorship, since repeatedly top race drivers and prize money, both assured by AHRA, failed to appear at Rockingham; and that AHRA had at least on one occasion scheduled another major event to conflict with a Rockingham date.

■ The issue of whether AHRA had substantially performed its obligations under the contract was well within the province of the jury, which found against AHRA on this issue by special verdict. Because the jury's finding precluded further inquiry under Count I, the questions of the special verdict relating to the existence of a release allegedly given by AHRA were necessarily unanswered. Thus, we do not reach plaintiff's claims of error in the court's instructions relating to the release, since, even if erroneous, they would not create grounds for reversal.

■ AHRA also claims that the court erred in admitting irrelevant evidence.[3] We need not even consider this claim in light of F.R.Civ.P. 61, which provides that "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." The evidence admitted was related to the conduct of the parties in their performance of the agreement. In our view, the trial court's determination of relevancy was an act of discretion which should not be disturbed absent a clear showing of abuse. Beaty Shopping Center, Inc. v. Monarch Ins. Co., 315 F.2d 467, 470 (4th Cir. 1963); United States v. 25,406 Acres of Land, 172 F.2d 990, 995 (4th Cir. 1949). We find none here. The rulings of the trial court were well within its province.

■ AHRA further contends the court erred in permitting the defendant Carrier to testify as an expert witness to public reaction to the repeated failure of advertised race drivers to appear in Rockingham. Carrier testified that continued false advertising "hurts your attendance." In view of Carrier's experience in racing promotions dating back to 1960, we see no abuse of the court's discretion in admitting this testimony. The competency of an expert witness is a matter resting within the sound discretion of the trial judge. United States v. 25,406 Acres of Land, 172 F.2d 990, 995 (4th Cir. 1949).

### III.

Count II of the complaint alleged that Carrier and IHRA had tortiously interfered with the Rockingham contract. It further alleged upon amendment that Carrier had breached his fiduciary duty in representing AHRA in its business relationships with Rockingham, and Land, et al. The special verdict resulted in judgment for the defendants on both issues, and AHRA has appealed.

■ In the case of Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176

---

3. The evidence complained of was to the effect that AHRA's officers and agents were difficult to deal with; that AHRA sanctioned races elsewhere; that AHRA over-advertised racers and purses; that AHRA failed to produce certain racers; and that AHRA refused to allow representatives of Land, et al, to man the pit gate.

(1954), the North Carolina Supreme Court summarized the elements of tortious interference with a contract.[4] In such an action, the plaintiff must allege and prove, *"First,* that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person;" . . . . *"Second,* that the outsider had knowledge of the plaintiff's contract with the third person;" . . . . *"Third,* that the outsider intentionally induced the third person not to perform his contract with the plaintiff;" . . . . *"Fourth,* that in so doing the outsider acted without justification;" . . . . and *"Fifth,* that the outsider's act caused the plaintiff actual damages." *Childress,* at 181–182.

In the instant case, the court instructed the jury that if they found that AHRA had failed to perform its obligations under the contract, then Carrier and IHRA could not be guilty of wrongfully interfering with the plaintiff's contract since the contract was no longer in existence. Because the jury found that AHRA had indeed failed to perform its obligations under the contract, it necessarily found for the defendants in accordance with the court's instructions.

In this appeal, AHRA contends the court erred in denying a proposed amendment to AHRA's complaint permitting a recovery for tortious interference with a business relationship as contrasted to a contract. But we have been cited to no North Carolina case which so holds. *Childress* requires the existence of a valid and enforceable contract. An extension of this requirement is mentioned in Johnson v. Gray, 263 N.C. 507, 139 S.E.2d 551 (1965), where the court said that "[m]aliciously inducing a person not to enter into a contract with another, which he would otherwise have entered into, is actionable if damage results." *Johnson,* supra, at 553. See also Spartan Equipment Co. v. Air Placement

Equipment Co., 263 N.C. 549, 140 S.E.2d 3, 11 (1965). Even should we consider that the law in North Carolina may be decided as contended by AHRA, that mere business relationship will suffice and neither an existing or prospective contract is required, see Restatement, Torts § 766(b), we may not overlook the fact that in the instant case an enforceable contract did not exist nor did the Rockingham defendants contemplate entering into a new agreement or relationship.

■ It should also be noted that both the pleadings and the pre-trial order were framed in terms of "tortious interference with a contract." No attempt was made to amend the pleadings until after three days of trial and at the close of the evidence. The court properly treated the proposed amendment as an amendment to conform to the evidence under F.R.Civ.P. 15(b). Rule 15(b) provides that if issues "not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In this case, AHRA does not place itself within either the letter or spirit of the rule. The issue sought to be raised by late amendment was not "tried by express or implied consent of the parties." Far from it, for almost two years of pleading, amendments, interrogatories, requests for admission, pre-trial orders and briefs, and all the other trappings of a multi-party, multi-issue (26) trial, including the trial itself, the issue was whether or not the contract had been interfered with, not whether there had been an interference with a business relation. This was quite clear to everyone and indeed AHRA never contended in the district court that the sought for issue had been tried at all. Under the circumstances, the district judge properly ruled that he did not think the amendment "would be fair." In our opinion, this was not an abuse of discretion. It

---

4. *Caveat.* Nothing we say here should intimate an opinion that a party to a contract

may be found guilty of a tortious interference with it.

has been held, on facts similar to these, that courts may properly reject an amendment offered at or after the evidence has closed, purportedly to conform to the evidence. See, e. g., United States v. An Article of Drug, 320 F.2d 564 (3d Cir. 1963); Caddy-Imler Creations, Inc. v. Caddy, 299 F.2d 79, 84 (9th Cir. 1962); Chesapeake & Ohio Ry. v. Newman, 243 F.2d 804, 812 (6th Cir. 1957); Gaines W. Harrison & Sons, Inc. v. J. I. Case Co., 180 F.Supp. 243, 248 (E.D.S.C.1960).

█ AHRA further contends that, since the jury found Carrier was an agent of AHRA, it necessarily should have found a breach of Carrier's fiduciary duty to AHRA in the conduct of its relations with Rockingham and Land, et al. Nevertheless, there was ample evidence from which the jury could have found that Carrier was performing his duties to the investors independent of his relationship with AHRA. The Rockingham contract is signed by Carrier as a third party. His duty ran both to AHRA and the Rockingham defendants. Moreover, his duties in promoting and insuring the future success of the Rockingham venture were extensive. AHRA knew of these duties and that they could quite easily conflict with the interests of AHRA. The jury was properly instructed and the evidence was fully and fairly presented on this point, and, since whether or not Carrier breached his duty to AHRA was a factual question, the finding of the jury on the basis of the conflicting evidence presented here binds the court. Lavender v. Kurn, 327 U.S. 645, 652, 66 S.Ct. 740, 90 L.Ed. 916 (1946); RFC v. Bankers Trust Co., 318 U.S. 163, 170, 63 S.Ct. 515, 87 L.Ed. 680 (1943).

### IV.

In Count IV, AHRA alleged that Carrier had violated a restrictive covenant not to compete given by Carrier to ARFCO in favor of AHRA. Executed on December 15, 1969, the agreement between Carrier and ARFCO provided as follows:

"WHEREAS, a contract for an exclusive territory exists between the American Hot Rod Association, Incorporated . . . and Auto Racing Franchise Company . . ., and

"WHEREAS, the officers and employees of ARFCO will receive valuable information, knowledge, and contracts in performing their duties under the aforesaid contract. . . .

"NOW, THEREFORE, in consideration of the benefits derived by ARFCO, the undersigned's employer, and in consideration of the moneys coming to the undersigned from ARFCO, the undersigned does hereby covenant, contract and agree that during the time he is an office holder of, a member of the Board of Directors of, or an employee of ARFCO, and for five (5) years after his total termination with ARFCO, he will not directly or indirectly, as principal, partner, agent, employee, or otherwise compete with AHRA, carry on or be concerned with, or be financially interested in drag race promotions, scheduling, or any other arrangements relating to drag racing, except as the owner of a single track, and will not directly or indirectly solicit or endeavor to obtain promoters, racers, sponsors, or any other person, partnership or corporation, under contract or agreement that relates or is connected with drag race promotions.
* * * * *"

The issue as to the existence of the covenant and whether supported by consideration was given to the jury which found it in effect and assessed damages of $100,000 against the defendant Carrier for his breach. Carrier has appealed, claiming the restrictive covenant is void as a matter of law. We agree.

In Welcome Wagon v. Morris, 224 F.2d 693, 698 (4th Cir. 1955), we observed that modern courts have employed three criteria in passing on these contracts: "(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is neces-

sary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy"?

■■■ North Carolina law, which is controlling here,[5] appears to follow the general trend of modern authority. Initially, we note that restrictive covenants not to compete in employment contracts, as here, are scrutinized more rigorously than similar covenants incident to a sale of business. Seaboard Indus., Inc. v. Blair, 10 N.C.App. 323, 178 S.E.2d 781, 787 (1971); Harwell Enterprises, Inc. v. Heim, 6 N.C.App. 548, 170 S.E.2d 540 (1969) (rev'd. on other grounds); 14 Williston on Contracts § 1643 (3d ed. 1972). And the burden is on the party seeking to enforce the contract to establish its reasonableness. Noe v. McDevitt, 228 N.C. 242, 45 S.E.2d 121, 123 (1947); Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543, 545 (1944).

■■■ It is generally observed in North Carolina that restrictive covenants not to engage in competitive employment are in partial restraint of trade; thus, to be enforceable they must be (1) in writing, (2) entered into at the time and as a part of the contract of employment, (3) based on valuable consideration, (4) reasonable both as to time and territory embraced in the re-

strictions, (5) fair to the parties, and (6) not against public policy. And it has been said that a failure in either requirement is fatal. James C. Greene Co. v. Kelley, 261 N.C. 166, 134 S.E.2d 166, 167 (1964); Asheville Associates, Inc. v. Miller, 255 N.C. 400, 121 S.E.2d 593, 594 (1961).

The reasonableness of the time and territory restrictions imposed in such contracts has been much litigated in North Carolina courts. As noted in Beam v. Rutledge, 217 N.C. 670, 9 S.E. 2d 476, 478 (1940), "[t]he test to be applied in determining the reasonableness of a restrictive covenant is to consider whether the restraint affords only a fair protection to the interest of the party in whose favor it is given, and is not so broad as to interfere with the rights of the public."

In Engineering Associates, Inc. v. Pankow, 268 N.C. 137, 150 S.E.2d 56 (1966), the North Carolina Supreme Court construed a covenant in which the employee, a "Project Engineer" of the plaintiff, promised not to work for any competitor of his employer for five years following termination. The covenant, as here, contained no territorial limitations. It was held invalid and unenforceable as being "unreasonable in view of the time and territory involved."[6] The court noted that "[i]t may be that in some instances and under extreme conditions five years would not be held to be unreasonable, but when it is coupled with no restrictions whatever as

5. Not argued by either party in the district court was the applicability of Tennessee law in determining the validity of the restrictive covenant. AHRA injects it into the case for the first time on appeal, although in its trial brief it relied solely on the law of North Carolina. While federal courts in diversity cases apply the choice of law rules prevailing in the forum state, Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941), we note that Tennessee law as regards restrictive covenants of employment, e. g., Allright Auto Parts, Inc. v. Berry, 219 Tenn. 280, 409 S.W.2d 361 (1966), a case involving facts at least as fa-

vorable to the employer as those presented here, is substantially the same as North Carolina's. See also Barner v. Boggiano, 32 Tenn.App. 351, 222 S.W.2d 672, esp. 675 (1948). Thus, we would reach a similar result regardless of which law is applied. In all events, since AHRA raises the question for the first time on appeal, we would not ordinarily be disposed to consider it. McGowan v. Gillenwater, 429 F.2d 586 (4th Cir. 1970).

6. The covenant was also invalid as lacking in consideration and being unsigned.

to territory there can be no doubt of its unreasonableness." 150 S.E.2d at 58.

In Henley Paper Co. v. McAllister, 253 N.C. 529, 117 S.E.2d 431 (1960), the court refused to enforce a similar covenant which prevented the employee from engaging in the manufacture, sale or distribution of paper or paper products in a territory extending in a 300 mile radius from any of the employer's divisions. The court took note of the fact that the territory extended "from Delaware to Alabama; from Indiana to the Atlantic," and found it excessive. "The contract excludes the defendant from too much territory and from too many activities. It is, therefore, void and unreasonable." 117 S.E.2d at 434.

In Noe v. McDevitt, 228 N.C. 242, 45 S.E.2d 121 (1947), the plaintiff, a supplier of beauty salon equipment, sought to restrain its former employee for five years from engaging in any similar business in both North and South Carolina. The court found the contract unenforceable. "Giving the plaintiff the benefit of very generous inferences, while he may have shown the conduct of a business to some extent in eastern North Carolina, he has not definitely shown any clientele throughout the much broader territory here involved such as would correlate the protection sought with any need of his business." 45 S. E.2d at 123.

In Comfort Spring Corporation v. Burroughs, 217 N.C. 658, 9 S.E.2d 473 (1940), the court refused to enforce a covenant restraining a former employee from selling for five years any product similar to those marketed by the employer "within the entire United States." The territory was found to be excessive. "[I]n the absence of any allegation or proof as to the territory over which the plaintiff's business extends, we are impelled to hold that the restriction upon the defendant to engage as a salesman for the Spring Products Corporation 'within the entire United States' is unnecessary for the protection of the plain-

tiff, and unreasonable and oppressive upon the defendant, and is, therefore, in restraint of trade and illegal and void." 9 S.E.2d at 475-76.

In a number of cases, North Carolina courts have upheld restrictive covenants. But in each the time and area restrictions were limited and no broader than necessary to protect the employer's legitimate interests. See, e. g., Beam v. Rutledge, 217 N.C. 670, 9 S.E.2d 476 (1940) (physician not permitted to practice medicine within 100 miles of the City of Lumberton, N. C., for five years); Sonotone Corp. v. Baldwin, 227 N.C. 387, 42 S.E.2d 352 (1947) (former district sales manager not permitted to sell competitors' products in 40 North Carolina counties and 9 South Carolina counties for one year); Welcome Wagon International, Inc. v. Pender, 255 N.C. 244, 120 S.E.2d 739 (1961) (former representative not permitted to engage in similar activities in Fayettevile, N. C., for five years); Asheville Associates, Inc. v. Miller, 255 N.C. 400, 121 S.E.2d 593 (1961) (insurance salesman not permitted to engage in similar business for one year in 14 county area of former representation); Harwell Enterprises, Inc. v. Heim, 276 N.C. 475, 173 S.E.2d 316 (1970) (employee of manufacturer, who was engaged in all phases of its business throughout the nation, not permitted to engage in the business of competitor for two years within the United States. In this case the covenant was, on demurrer, held not necessarily invalid.)

We are now called upon to construe the validity of a covenant which purports to prohibit the defendant from engaging in any aspect of the drag racing business for five years. According to its terms, he may not become in any way interested in drag race promotions, scheduling, or any other arrangements relating to drag racing. The covenant contains no territorial restraints limiting its application to particular cities, states, regions, or even countries where

AHRA's business interests might be threatened. The covenant is not to so engage in drag racing anywhere in the world for a period of five years.

Moreover, as in both *Noe* and *Comfort Spring*, there has been no allegation[7] as to the territory over which AHRA's activities extend, or in which it needs protection. Thus, there is no basis on which the court could properly determine whether the restrictive covenant in question is reasonably necessary for the protection of AHRA's business. The only state in the Southeast, for example, where AHRA has actively engaged in co-promoting races would appear to be North Carolina. Yet the restriction in the covenant applies not only throughout the Southeast, it covers the entire country, even the world. Nor does the covenant by its terms purport to apply solely to the area of the defendant's past representation, as did the agreement upheld by the court in *Asheville Associates*.

 Because the covenant is drawn broader than necessary for the protection of the plaintiff, and is therefore unreasonable, it is in restraint of trade and void. Comfort Spring Corp. v. Burroughs, 217 N.C. 658, 9 S.E.2d 473 (1940). Whether part of the contract might be deemed reasonable and enforceable is not the question. It comes to us as a single document. We must construe it as the parties made it. "The Court cannot by splitting up the territory make a new contract for the parties. It must stand or fall integrally." Henley Paper Co. v. McAllister, 253 N.C. 529, 117 S.E.2d 431, 435 (1960); Noe v. McDevitt, 228 N.C. 242, 45 S.E.2d 121, 123 (1947).

The judgment of the district court is accordingly

Affirmed in part; reversed in part.

---

7. There is a passing reference in the testimony that AHRA operated in 35 States. But the extent of the operation was not otherwise pleaded or proved. In 1969, AHRA co-promoted seven major races, as distinguished from mere sanctioning, which consists generally of selling insurance, accepting advertising in its publication, and apparently lending the race its approval. Ten races were similarly co-promoted in 1970. The extent of the operation of IHRA and the area of conflict is not shown in the record except at Rockingham. And the extent of AHRA operation in any State in which it operates is also not shown.